PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-2025

_____

UNITED STATES OF AMERICA,
Appellant

v.

KAMAAL MALLORY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-12-cr-00379-001)
District Judge:  Honorable Mary A. McLaughlin

_____

Argued January 22, 2014

Before:  FUENTES and FISHER, *Circuit Judges*, and
STARK,[*] *District Judge*.


(Filed:  September 3, 2014)

Virgil B. Walker, Esq.

Robert A. Zauzmer, Esq.  **ARGUED**
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

        counsel for Appellant

Catherine C. Henry, Esq.

Joseph M. Miller, Esq.

Brett G. Sweitzer, Esq.  **ARGUED**
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

        counsel for Appellee

---

[*]The Honorable Leonard P. Stark, District Judge for
the United States District Court for the District of Delaware,
sitting by designation.

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

In nearly all circumstances, we require police officers to obtain a warrant supported by probable cause before engaging in a search or seizure of a person, their house, their papers, or their effects. One of the few exceptions to this rule allows police to conduct a warrantless search or seizure when exigent circumstances require them to act with such alacrity that requiring them to first obtain a warrant would be unreasonable. The question at the heart of this case requires us to determine whether an exigency has abated such that officers are no longer excused from the warrant requirement.

I.

A.

In the late evening and early morning hours of January 14 and 15, 2012, Kamaal Mallory and his stepbrother Ismail Abu Bakr were at the home of Delaine Abu Bakr, Ismail's mother and Mallory's stepmother, who resided at 3434 Old York Road in Philadelphia, Pennsylvania. At the time, both Mallory and Ismail[1] were employed as emergency medical technicians for the Northwest Care Ambulance Company.

---

[1] Because several of the individuals in this case share the same last name, we will refer to them, when necessary, by their first name.

Mallory did not live with Delaine full-time, but he and his two daughters often stayed with her on weekends, and planned to do so on the weekend of January 13th through the 15th.

Between about 1:45 and 2:30 a.m. on the 15th, Mallory and Ismail were standing with friends in front of a neighbor's home. Officer Eric Enders approached them in a police cruiser, shined a spotlight on them, and ordered them to disperse. Although they complied with this order, Ismail cursed at Officer Enders, telling him to stop shining the spotlight in his face. Officer Enders and his partner then detained Ismail for disorderly conduct, placing him in the backseat of the cruiser, and driving around the corner.

Meanwhile, Mallory returned to his stepmother's house where his stepsister, Siddiqah Abu Bakr, let him in. Siddiqah had observed through a window the situation unfolding outside, and awoke her mother to tell her what was happening. After Siddiqah returned to the window, she saw Ismail being placed into the cruiser, which had left by the time Delaine came downstairs. Officer Enders detained Ismail for a few minutes before removing his handcuffs and releasing him. Ismail walked back toward his mother's house, seeing two police cruisers out front.

At 2:33 a.m., Officers Richard Hough and William Lynch, Jr., received a dispatch advising them that there was a group of men outside on the 3400 block of Old York Road, and that one of them was armed with a gun. The allegedly armed man was a black male wearing a brown leather jacket over a black hooded sweatshirt. The officers arrived at 3434 Old York Road about five minutes after receiving the dispatch.

Delaine, who by this time was standing outside on her

4

porch, approached the driver's side door of the second cruiser to speak with Officers Hough and Lynch. She asked them whether they had arrested Ismail. While they were speaking, Officer Hough noticed a man standing nearby who matched the description of the suspect. This man was later identified as Mallory. The District Court observed that it remains unclear precisely where Mallory was standing in relation to Delaine, but it is undisputed that Mallory was outside and in view of the officers.

At one point, Mallory spoke with Officers Hough and Lynch, and as he did so his jacket lifted to reveal a revolver stuck in his waistband. When Officer Hough observed this, he exclaimed "gun!" in order to alert his partner to the presence of a weapon. Officer Hough exited the vehicle and ordered Mallory to stop, but Mallory instead ran into Delaine's house, shutting the door behind him.

The officers gave chase. Siddiqah, who had come outside, briefly blocked the officers' entry, shouting that they had no right to enter without a warrant. They pushed her aside and Officer Hough kicked the door, breaking the latch. Someone inside blocked the door from opening, and Officer Hough kicked the door several times, breaking loose a lower panel on the door.[2] The person holding the door shut relented and Officer Hough opened the door, which, when one faced it from outside, swung in and to the left.

It was dark inside the house. The officers entered with

---

[2] At the suppression hearing, Officer Hough claimed that he had seen Mallory hide the gun under some umbrellas through the hole in the door. The District Court rejected his claim as lacking credibility, and the Government does not challenge that factual finding on appeal.

5

weapons drawn, followed inside by Siddiqah and Delaine. Siddiqah was distraught, and the officers told them both to exit the house. It was then that another of Mallory's stepsisters, Tazkeyah Abu Bakr, came down the stairs. One of the officers pointed his weapon at her and told her to leave the house, and Tazkeyah joined Delaine and Siddiqah on the front porch.

While Officer Hough was kicking in the door, Officer Lynch had called for backup. When Officers Kevin Gorman and Kevin Robinson arrived shortly thereafter, Officers Hough and Lynch had already entered the house and were awaiting them in the first floor living room. Officer Hough ordered Officers Gorman and Robinson to stay on the first floor, with instructions to prevent the family from reentering the house. Officers Hough and Lynch then began searching the four-story home for Mallory, beginning on the top floor and working their way down. They searched for Mallory in places where a person could hide, such as rooms and closets. They also searched for the firearm in places where a firearm could be hidden, like inside drawers and under pillows. During the search, Ismail returned and briefly argued with one of the officers before Delaine persuaded him to join the rest of the family on the front porch.

During the search of the house, supervising Officer Sergeant Marc Hayes arrived.[3] He spoke with Delaine, who explained that the family had been instructed to wait on the porch while the officers searched the house, but that it was cold outside. Sergeant Hayes allowed the family to wait in the living room, but when Officer Hough came back

---

[3] The District Court concluded that although it was unclear precisely how many officers were at the home, there were at least five.

6

downstairs and saw this he explained to the Sergeant that he did not want the family in the house until the officers had recovered the firearm. The family was sent back outside.

The officers eventually located a locked bathroom on the first floor, which they had at first overlooked because they thought it was an exterior door. Believing that Mallory was hiding in the bathroom, the officers asked Delaine if she had a key, which she did not. No response came from within the bathroom when Delaine asked Mallory to come out. The officers used a crowbar to pry open the door, finding Mallory inside. They arrested and handcuffed him, and began to escort him through the first floor to the front door.

As the officers proceeded with Mallory from the rear of the house to the front door, one of them asked whether the area behind the opened front door had been searched.[4] Officer Hough then recovered a revolver from "under or behind umbrellas located on the left side of the foyer behind the front door, which had been swung open into the house." *United States v. Mallory*, No. 12-379, 2013 WL 943407, at \*5 (E.D. Pa. Mar. 12, 2013).

### B.

Mallory was indicted in the United States District Court for the Eastern District of Pennsylvania on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). He moved to suppress the gun. The District Court held a suppression hearing and heard

---

[4] There is some dispute about what precisely the officer said. Ismail testified at the suppression hearing that he heard an officer ask whether the area had been searched; Siddiqah and Tazkeyah testified that they heard one officer say "check behind the door."

testimony from one witness for the Government – Officer Hough – and five witnesses for the defense – Ismail, Delaine, Siddiqah, Tazkeyah, and Richard Thomas, III, a friend of Mallory's.

The District Court granted the motion to suppress. It held first that Mallory had a legitimate expectation of privacy in Delaine's home because, although he did not reside there, he and his daughters spent weekends there and were staying there the night of his arrest. Accordingly, he had standing to challenge the legality of the search. *Mallory*, 2013 WL 943407, at *6. The Government does not challenge this holding on appeal.

On the merits, the District Court concluded that the officers had probable cause to believe that Mallory had committed the crime of carrying a firearm "upon the public streets" of Philadelphia, in violation of 18 Pa. Cons. Stat. Ann. § 6108, and that their warrantless entrance into the home was justified under the exigent circumstances doctrine because they were in "hot pursuit" of a fleeing Mallory. *Mallory*, 2013 WL 943407, at *6-7. This exigency allowed the officers not only to enter the home and search for Mallory, but also to search places too small for a person to hide in order to recover the firearm. *Id.* at *7-8. However, once the police had found and secured Mallory, the exigency justifying their warrantless search – hot pursuit of an armed suspect – no longer existed. The District Court disagreed with the Government that Officer Hough's search was justified to prevent the imminent destruction of evidence, another of the recognized exigencies that may render a warrantless search reasonable. Because exigent circumstances no longer existed, the District Court concluded, Officer Hough's warrantless search behind the door to

8

recover the gun was illegal and suppression was required.[5]

The District Court's order granting suppression was signed on March 11, 2013, and was entered on the docket on March 12, 2013. The Government filed a notice of appeal on April 10, 2013, which stated that it was appealing "the order of [the District Court] entered on March 11, 2013." SA at 1. The Government failed to certify that the appeal was "not taken for purpose of delay and that the evidence [suppressed] is a substantial proof of a fact material in the proceeding," as required under 18 U.S.C. § 3731. Realizing its mistake, the Government filed an amended notice of appeal the next day that included the required certification.

## II.

Before we proceed to the merits, we must resolve disputes over both our jurisdiction and the appropriate standard of review.

## A.

Mallory argues that we lack jurisdiction over this appeal because the Government failed to timely comply with the certification requirement of § 3731. His argument proceeds in three steps: first, that compliance with § 3731 is a jurisdictional prerequisite; second, that the thirty-day window within which the Government must file its appeal under § 3731 also applies to the certification requirement; and third, that the time limit begins on the date that the suppression order was "rendered," not the date that it was entered on the docket, which in this case would mean that the Government missed the deadline by a single day.

_____

[5] The District Court also rejected the Government's inevitable discovery argument, which the Government does not press here.

9

Section 3731 grants this Court appellate jurisdiction over Government appeals from certain adverse rulings in a criminal case. Of relevance here, § 3731 states:

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

18 U.S.C. § 3731. The Federal Rules of Appellate Procedure require that the Government, when entitled to appeal in a criminal case, must file notice of its appeal within thirty days after "the *entry* of the . . . order being appealed," Fed. R. App. P. 4(b)(1)(B)(i) (emphasis added), and an "order is entered for purposes of this Rule 4(b) when it is entered on the criminal docket," Fed. R. App. P. 4(b)(6). Section 3731, on the other hand, states that "[t]he appeal . . . shall be taken within thirty days after the decision, judgment or order has been *rendered* . . . ." 18 U.S.C. § 3731 (emphasis added). Mallory claims that the difference in language is important: a decision is "rendered" when it is announced, either orally or in writing, by the judge; it is "entered" when it is recorded on the docket. Mallory Br. at 27-28 (quoting Black's Law Dictionary 531, 1296 (6th ed. 1990)). In his view, then, the clock began ticking when the District Court's suppression order was signed on March 11, and the Government's amended notice of appeal (which included the certification) was filed one day late, on April 11. The Government disputes this, arguing that the thirty-day period began when the order was entered on the

docket on March 12, meaning that its amended filing was timely.

We conclude that the Government's amended notice of appeal, filed on April 11, was timely under both Rule 4(b)(1)(B) and § 3731. In *United States v. Midstate Horticultural Co.*, 306 U.S. 161 (1939), the Supreme Court interpreted the language of a predecessor to § 3731. That statute's filing deadline for Government appeals was *in haec verba* with § 3731's filing deadline, requiring that "[t]he appeal . . . shall be taken within thirty days after the decision or judgment has been *rendered* . . . ." 18 U.S.C. § 682 (1934 ed.) (emphasis added). In *Midstate*, the district court had "filed" the opinion from which the Government appealed on June 16, 1938, but had not "entered" the order until July 2, 1938. 306 U.S. at 163 n.2. The Government filed its appeal on July 20, 1938, which was eighteen days after entry of the final order but more than thirty days after the opinion was filed. *Id.* The defendant sought to dismiss the appeal for failure to comply with the deadline, but the Court summarily dismissed this argument, concluding that "[t]he appeals were from the judgments and orders of July 2, and not the previous written opinion." *Id.*

*Midstate* establishes that the limitations period of § 3731 began to run on the date that the District Court's order was entered on the docket, and under that calculus the Government's certification was timely. We are not persuaded that Congress intended that there be a different operative date for appeal deadlines between Rule 4 and § 3731, notwithstanding the slight difference in language. *See In re Hurley Mercantile Co.*, 56 F.2d 1023, 1025 (5th Cir. 1932) (observing that "in the scheme of federal appeals we believe the statutes have used the terms 'rendition' and 'entry' interchangeably rather than with technical accuracy"). The

11

certification requirement ensures "'a conscientious pre-appeal analysis by the responsible prosecuting official.'" *United States v. Smith*, 263 F.3d 571, 577 (6th Cir. 2001) (quoting *United States v. Carrillo-Bernal*, 58 F.3d 1490, 1494 (10th Cir. 1995)). That purpose is not served by artificially restricting the time that the Government has to determine whether it should appeal.[6] Because we conclude that the Government's certification was timely, it is unnecessary for us to decide whether the 30-day limitations period applies to the certification requirement, or whether that requirement is

---

[6] If we adopted Mallory's argument, that could lead to results entirely inconsistent with the purpose of the statute. In this case, one day separated the District Court's signing of the order from its entry on the docket. But it is certainly imaginable that administrative delays may, occasionally, lead to a longer gap between a judge signing an order and it being entered on the court's Case Management/Electronic Case Files ("CM/ECF") system. To see the problem with Mallory's position, one need only consider the following hypothetical. Suppose that a judge signed an order granting a motion to suppress on the first day of the month, but for some reason the clerk did not enter it onto CM/ECF until the 29th of the month. Under Mallory's rubric, the Government would have only a single day to determine whether it should file its appeal. This would hardly serve § 3731's purpose of encouraging the Government to carefully consider whether it should exercise its appellate rights.

jurisdictional.[7]

B.

We review the District Court's order granting a motion to suppress for clear error with respect to the underlying factual findings, "but we exercise plenary review over legal determinations." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). The parties disagree, however, on how that standard applies in this case. The Government claims to have no quarrel with the District Court's factual findings and asserts that it is challenging only the legal conclusion that the exclusionary rule applies. It urges us to review this decision de novo. Mallory, however, reads the Government's appeal as a challenge to the factual finding that any exigency

---

[7] Mallory contends that we have already determined that the certification requirement is jurisdictional. *See United States v. Bergrin*, 682 F.3d 261, 276 (3d Cir. 2012) (observing that "[w]e . . . have appellate jurisdiction . . . so long as" the Government files the § 3731 certification); *United States v. Kepner*, 843 F.2d 755, 761 (3d Cir. 1988) (generally referring to each of the requirements under § 3731 as "jurisdictional prerequisites"); *In re Grand Jury Investigation*, 599 F.2d 1224, 1226 (3d Cir. 1979) (noting our jurisdiction in light of the Government's compliance with the certification requirement). We do not reach the merits of the jurisdictional question and, therefore, express no opinion on it. But we are skeptical that these decisions settled the matter, as timely compliance with the certification requirement was not a contested issue in any of them. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) (cautioning against reliance on "drive-by jurisdictional rulings" applying "less than meticulous" analysis of jurisdictional questions (internal quotation marks and citation omitted)).

13

justifying warrantless entry into the home dissipated after Mallory was taken into custody, a conclusion that he contends we should review for clear error. Mallory's argument rests on *United States v. Coles*, in which we stated that "[t]he presence of exigent circumstances is a finding of fact, which we review for clear error." 437 F.3d 361, 366 (3d Cir. 2006). The Government asserts that this statement is unsupported dictum that is not binding on this panel.

Although a precedential opinion of this Court can be overruled only by the Court sitting en banc or the Supreme Court, it is "well established that a subsequent panel is not bound by dictum in an earlier opinion." *Mariana v. Fisher*, 338 F.3d 189, 201 (3d Cir. 2003) (citing 3d Cir. IOP 9.1 and *Burstein v. Ret. Account Plan for Emps. of Allegheny Health Educ. and Research Found.*, 334 F.3d 365, 375-76 (3d Cir. 2003)). We have defined dictum as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding – that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) (internal quotation marks omitted) (quoting *Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986)).

The statement in *Coles* is dictum because the existence of an exigency was not a contested issue in that case, a fact that becomes apparent when the statement is read in context:

> The presence of exigent circumstances is a finding of fact, which we review for clear error. The District Court found that exigent circumstances – the possibility of evidence being

14

> destroyed – existed *after* the officers knocked on the hotel room door and demanded entry. *Coles does not challenge that finding on appeal.* He asks us to review only . . . whether the police improperly created the exigency. *Our attention is thus focused upon this second prong for the remainder of our discussion*.

437 F.3d at 366 (first emphasis in original) (citation and footnote omitted). The Court then considered whether the police had created the exigency upon which they relied to justify their warrantless entry into a hotel room, taking as established that an exigency existed. *Id.* at 370. The statement regarding the standard of review served no part in the analysis and thus could be "deleted without seriously impairing" the Court's reasoning. *McDonald*, 205 F.3d at 612. Accordingly, we conclude that the statement in *Coles* is nonbinding dictum and that we must determine in the first instance whether a District Court's finding on the presence or absence of exigent circumstances is subject to clear error or de novo review.

Which standard of review is appropriate in a given circumstance depends on which judicial actor – the trial judge or the appellate panel – has a comparative advantage in resolving the issue at hand. In *United States v. Brown*, we adopted a "functional analysis" for determining the appropriate standard of review for mixed questions of law and fact, an analysis that reflects the relative institutional competencies of district courts and courts of appeals. 631

15

F.3d 638, 644 (3d Cir. 2011). When there is a need "to control and clarify the development of legal principles" through the "collective judgment" of appellate courts, de novo review is appropriate. *Id*. at 643 (citing *Ornelas v. United States*, 517 U.S. 690, 697 (1996)). On the other hand, trial judges are better positioned to assess such questions as "witness credibility and juror bias" because these matters turn on "evaluations of demeanor," and therefore we overturn such findings only if they are clearly erroneous. *Id.* We explained the dichotomy further:

> If application of the rule of law to the facts requires an inquiry that is "essentially factual" — one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct" — the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

16

*Id*. (quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984) (en banc), *abrogated on other grounds by Pierce v. Underwood*, 487 U.S. 552 (1988), *as recognized in Deegan v. Cont'l Cas. Co.*, 167 F.3d 502, 506 (9th Cir. 1999)).

When a district court makes factual findings supporting a conclusion that exigent circumstances existed, it makes the type of credibility determinations that district courts are best suited to make, and accordingly we will defer to them unless they are clearly erroneous. But whether the historical facts of a warrantless search or seizure meet the legal test of exigency is the type of question that involves the careful consideration of legal precepts and the values that underlie them, questions that favor de novo review. It is "a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *United States v. Harrison*, 689 F.3d 301, 306 (3d Cir. 2012) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). Nowhere is this more true than in the home, the threshold of which may only be crossed without a warrant or consent when exigent circumstances exist. *See Payton v. New York*, 445 U.S. 573, 590 (1980); *id*. at 585 ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal citation and quotation marks omitted)); *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."). De novo appellate review of district court decisions regarding the existence of exigent circumstances is appropriate to carefully police the boundaries of this exception and to ensure

that it does not erode the protections of the Fourth Amendment.

We conclude that, on appeal from a decision involving the presence or absence of exigent circumstances justifying a warrantless search or seizure, this Court will review the district court's findings of fact for clear error, but will review its conclusion that those facts establish a legal exigency de novo. This decision is consistent with the law in every other circuit,[8] and it is consistent with our own decisions regarding mixed questions of law and fact. *See, e.g., United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002) (stating that, on appeal of denial of a motion to suppress, we review the underlying facts for clear error and the application of law to the facts de novo). Likewise, we will review de novo a district court's conclusion that a previously-existing exigency has dissipated.

### III.

It is undisputed that the officers had probable cause to believe that Mallory had committed a crime and that exigent

---

[8] *See, e.g., United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995); *United States v. Reyes*, 353 F.3d 148, 151 (2d Cir. 2003); *United States v. Singleton*, 441 F.3d 290, 293 (4th Cir. 2006); *Tamez v. City of San Marcos, Texas*, 118 F.3d 1085, 1094 (5th Cir. 1997); *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990); *United States v. Howard*, 961 F.2d 1265, 1267 (7th Cir. 1992); *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005); *United States v. Sarkissian*, 841 F.2d 959, 962 (9th Cir. 1988); *United States v. Stewart*, 867 F.2d 581, 584 (10th Cir. 1989); *United States v. Franklin*, 694 F.3d 1, 7 (11th Cir. 2012); *In re Sealed Case 96-3167*, 153 F.3d 759, 764 (D.C. Cir. 1998).

circumstances justified their warrantless entry into the home and subsequent search for him. We must determine whether, after police had located and secured Mallory, an exigency remained that justified Officer Hough's search behind the door, which produced the revolver. The Government argues that two exigent circumstances justified the search: first, that it was necessary to secure the firearm to protect the safety of the officers and to prevent escape, and second, that it was necessary to recover the weapon to prevent it from being moved and hidden while a warrant was being procured.[9]

The Fourth Amendment protects the people from "unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches of the home "are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." *Coles*, 437 F.3d at 365 (emphasis in original) (citing *Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton*, 445 U.S. at 586). We evaluate whether exigent circumstances existed by an objective standard; the subjective intent of the officer is irrelevant. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404

---

[9] Equally important as the arguments the Government makes are the arguments it does not make. It does not argue that Officer Hough's search was justified as a search incident to a lawful arrest, *see Chimel v. California*, 395 U.S. 752 (1969), that the gun was found in the course of a protective sweep, *see Maryland v. Buie*, 494 U.S. 325 (1990), or that the inevitable discovery rule applies, *see Nix v. Williams*, 467 U.S. 431 (1984). Instead, it argues only that exigent circumstances allowed Officer Hough to search behind the door. Accordingly, we express no opinion on whether Officer Hough's search may have been justified under another exception to the warrant requirement.

(2006).  The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is "heavy."  *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

Exigent circumstances exist when officers are in hot pursuit of a fleeing suspect, *Coles*, 437 F.3d at 366, when they "reasonably . . . believe that someone is in imminent danger," *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006) (internal citation and quotation marks omitted), or when they reasonably believe that they must act "to prevent the imminent destruction of evidence," *Brigham City*, 547 U.S. at 403 (citing *Ker v. California*, 374 U.S. 23, 40 (1963) (plurality opinion)).  The common thread is imminence – "the existence of a true emergency."  *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011).  "[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises."  *United States v. Murphy*, 516 F.3d 1117, 1121 (9th Cir. 2008) (citing *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978)), *abrogated on other grounds by Fernandez v. California*, 134 S. Ct. 1126 (2014).

The Government primarily contends that the search was justified by a need to protect officer safety and to prevent Mallory's escape.  In support of this argument, it relies on *Warden v. Hayden*, 387 U.S. 294 (1967).  In *Hayden*, police entered a home without a warrant after receiving a report that a man who had just committed an armed robbery had run into the residence.  *Id*. at 297.  Multiple officers searched the basement, first, and second floors of the home, finding Hayden feigning sleep in an upstairs bedroom.  *Id*. at 298.  At the same time that Hayden was located, the officers found a shotgun and a pistol in the flush tank of a toilet, ammunition in a bureau drawer in Hayden's room, and evidence of the

20

robbery in a washing machine. *Id.* The Supreme Court upheld the legality of the officers' entry into the home and their search, explaining that

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

*Id.* at 298-99. The Court held that "[t]he permissible scope of search must . . . be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape." *Id.* at 299.

In the Government's view, Officer Hough's search was legal under *Hayden* because it occurred as the officers escorted Mallory out the door in order to "maintain control of Mallory and prevent any access to a weapon by either him or anyone who would aid him." Gov't Br. at 18-19. But critical to *Hayden*'s reasoning was the fact that "the seizures occurred *prior to or immediately contemporaneous with* Hayden's arrest, as part of an effort to find a[n armed] suspected felon." *Id.* at 299 (emphasis added). This case differs from *Hayden* because the gun was not found "prior to or contemporaneous

21

with" Mallory's arrest, but *after* the premises had been secured, Mallory had been located and handcuffed, and as he was being led out the front door by multiple officers. The District Court found that Mallory "had already been apprehended and handcuffed before Hough began looking for the gun," and that his family members, except for his stepmother, were waiting outside the home. *Mallory*, 2013 WL 943407, at \*10. As it recognized, "by the time Officer Hough decided to 'check behind the door,' he and his partner had conducted a thorough sweep of the premises and had determined that the house did not contain any confederates who might aid Mallory in an escape or acts of aggression." *Id.* at \*11. The Government does not claim that these factual findings are clearly erroneous.

Three decisions from other courts of appeals, each relied on by the District Court, provide useful guidance for our analysis. In *United States v. Ford*, officers entered an apartment with an arrest warrant for the defendant based on a crime committed months earlier. 56 F.3d 265, 267 (D.C. Cir. 1995). After handcuffing the defendant, an officer entered a bedroom as part of a protective sweep, where he found a .45 caliber magazine in plain view. *Id.* Notwithstanding the fact that there were no people in the bedroom, the officer lifted a mattress, under which he found live ammunition, money, and crack cocaine, and searched behind the window shades, where he found a handgun. *Id.* Allowing that the officer was entitled to enter the bedroom as part of a protective sweep, the D.C. Circuit concluded that the search under the mattress and behind the shades exceeded the scope of the protective sweep and rejected the Government's alternative argument (made in reliance on *Hayden*) that the presence of the magazine created a threat to the officers' safety, justifying a further search. *Id.* at 271. The court distinguished *Hayden*

22

because the crime at issue occurred months rather than minutes earlier, and because the search occurred "*after*, not prior to or contemporaneous with Ford's arrest." *Id.*

In *United States v. Goree*, police responding to a domestic violence report entered a home without a warrant. 365 F.3d 1086, 1090-91 (D.C. Cir. 2004). They found a man and a woman inside the darkened residence, and handcuffed the man after he failed to heed their instructions to put his hands in the air. *Id.* at 1088. The officers walked him into the dining room so that he could sit down, where they found a loaded magazine in plain view on the table. *Id.* One of the officers then entered the kitchen to search for a weapon, finding a pistol on top of the refrigerator. *Id.* The defendant moved to suppress the weapon, which the district court denied. On appeal, the defendant conceded that exigent circumstances justified the officers' entry into the apartment, and that their first look into the kitchen was justified as a protective sweep under *Buie*. *Id.* at 1090. He argued only that the seizure of the gun "was the product of a second warrantless search of the kitchen, unjustified by exigent circumstances." *Id.* On this point, the D.C. Circuit remanded for further factual development.

The court identified two issues about which it had insufficient information to determine whether the need to protect officer safety justified the search. First, it needed more information about the extent of the claimed exigency. Had the woman in the apartment been moving about freely, or had she been secured by an officer? *Id.* at 1094. Was there other evidence that she posed a threat? *Id.* Second, the court needed to know more about the scope of the intrusion. How far was it from the dining room table where the defendant was secured to the refrigerator where the gun was found? *Id.* Was the path between the two direct or obstructed? *Id.* How

well had the defendant been secured, and how easily could he have obtained the weapon from the kitchen? *Id.* Without further evidence on these issues, it was not possible for the court to determine whether an exigency justified the warrantless search.

Finally, we consider the First Circuit's decision in *United States v. Lopez*, 989 F.2d 24 (1st Cir. 1993). There, officers responded to a report that a shirtless Hispanic male wearing camouflage pants had threatened someone with a sawed-off shotgun. Officers arrived and saw Lopez, who matched the description, outside. *Id.* at 25. Ignoring the officers' commands to halt, Lopez ran into the building and police followed. Lopez was apprehended and handcuffed in a small bedroom, after which police began to search for the shotgun. *Id.* One officer entered an adjoining bathroom and saw that a ceiling tile was missing. Standing on top of the toilet, the officer looked into the ceiling and saw a large bag, which turned out to contain cocaine, as well as the butt of the shotgun. *Id.* As the officer climbed down off the toilet, the ceiling tiles collapsed and the shotgun fell to the floor.

Recognizing that the "facts may press close to the outer limit of the Fourth Amendment," the First Circuit upheld the legality of the search "[b]y a close margin." *Id.* at 26-27. The officers had good reason to believe that a dangerous weapon was nearby, and although Lopez himself, once handcuffed, did not present a danger, the police "had no assurance that Lopez was acting alone . . . or that the apartment was secure." *Id.* at 26. One of the officers testified to hearing the footsteps of multiple people in the house, and the fact that the building was a "dilapidated, multi-tenant structure" made it reasonable to believe that other people in the vicinity could obtain and use the shotgun. *Id.* at 26-27 & n.1. Furthermore, the search was not particularly intrusive.

*Id.* at 27 (observing that "the officer saw the opening in the bathroom ceiling through an open door, entered the empty room, and with little effort saw the butt of the weapon").

From *Hayden*, *Ford*, *Goree*, and *Lopez* we can discern factors that will be useful for determining whether the search in this case was justified by a reasonable belief that it was necessary to protect officer safety. These factors may include, but are not limited to: how soon after the alleged offense the search occurred; whether the alleged offense was violent in nature; whether the search occurred prior to or contemporaneous with Mallory's apprehension; whether the premises as a whole had been secured, or whether it was possible that unknown individuals remained in the house; whether Mallory or any of his family members had acted in an aggressive or threatening manner toward the police; whether other members of the family were free to move about the house unsupervised by an officer; how easily Mallory or a family member could have obtained and used the firearm; and the degree of intrusiveness of the search. In light of these considerations, we agree with the District Court that any exigency justifying a warrantless search had dissipated by the time Officer Hough recovered the gun, and therefore suppression was warranted.

By the time Officer Hough searched behind the door and under an umbrella to find the gun, the police had secured Mallory, the family, and the home, and were in control of the situation. Mallory was in handcuffs and was being escorted out of the house by multiple officers. *Cf. Hayden*, 387 U.S. at 299 (conditioning the scope of a search to be "as broad as may reasonably be necessary to prevent the dangers that the suspect *at large* in the house may resist or escape" (emphasis added)). Although he had earlier fled arrest, there is no indication that Mallory resisted either physically or orally

25

once he was located in the bathroom.  *See Simmons*, 661 F.3d at 157-58 (concluding that exigent circumstances to search for a firearm were absent when the suspect was "very cooperative and non-combative," and the premises was "full of cops" (internal quotation marks omitted)).  The house had been thoroughly swept and there were no persons left unaccounted for who might attack the officers by surprise.  *Cf. Lopez*, 989 F.2d at 26-27 (finding that "police had no assurance . . . that the apartment was secure").  There is no evidence that Mallory's family members posed a threat to the officers, or that they even knew the location of the gun.  Each of the family members save Delaine was outside on the porch, and Delaine, far from being threatening, had actually attempted to assist the officers in apprehending Mallory without violence by urging him to come out of the locked bathroom. The Government makes the generalized assertion that "police had not recovered the gun they saw in Mallory's possession, and the family members were hostile to the police action," Gov't Br. at 31, but that hostility consisted primarily of two family members briefly protesting the warrantless entry of their home in the middle of the night.  *See United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004) (recognizing "that a nighttime search is particularly intrusive").  There is no evidence that this brief hostility continued, and the family was under police supervision.

The Government makes much of the fact that the gun lay in the path that the officers took in escorting Mallory out of the house, a fact of which Mallory was aware but the police were not, and that Mallory could have "lunge[d] for the hidden and very nearby gun."  Gov't Br. at 28-29.  This argument has some merit.  But nonetheless, Mallory was handcuffed and under the control of multiple officers and he had not – since coming under the officers' control – acted

26

violently or aggressively. Likewise, we recognize that Mallory's alleged crime had taken place only minutes earlier and that the crime of unlawful possession of a firearm, while not itself a crime of violence, could certainly lead the officers to reasonably be concerned that their suspect could be dangerous. However, the officers' securing of the premises and apprehension of Mallory were intervening events allaying any imminent need to locate the gun.

The Government also argues that the search was justified by a need to prevent the gun from being moved and hidden, in order to preserve evidence of the crime. The exigent circumstances doctrine allows the police to engage in a warrantless search in order to prevent "the 'imminent destruction of evidence.'" *United States v. King*, 604 F.3d 125, 147 (3d Cir. 2010) (quoting *Couden*, 446 F.3d at 496). We reject this argument for many of the same reasons that we reject the Government's prior argument. The Government presented no evidence that there was an imminent risk that a family member would move the gun. As we noted above, there is no evidence that the family members even knew where it was. In fact, the evidence of record suggests that every family member but Delaine was under supervision outside the house, and Delaine had demonstrated her compliance by cooperating with the officers. As the District Court noted, once Mallory was secured "speed was not essential . . . and anyone else who could have destroyed or hidden the gun was under police supervision." *Mallory*, 2013 WL 943407, at *11. At that point, nothing prevented the officers from continuing to control the residence and prevent the family from finding and moving the gun until they could obtain a search warrant. *See Illinois v. McArthur*, 531 U.S. 326, 331-32 (2001) (allowing police to prevent a man whom they had probable cause to believe had hidden marijuana in

his trailer, and which he would likely destroy if permitted, from reentering his home for two hours while they obtained a search warrant).

## IV.

If *Lopez* "press[ed] close to the outer limit of the Fourth Amendment," 989 F.2d at 27, then this case falls just outside it. We do not mean to underplay the dangers that police officers may face when pursuing a suspect into an unfamiliar building. Nonetheless, once the officers had secured the premises and apprehended Mallory, the exigencies of the moment abated and the warrant requirement reattached. We therefore affirm the order of the District Court granting Mallory's motion to suppress.