**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3604
_____

UNITED STATES OF AMERICA

v.

ATIBA WARREN,
                    Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-13-cr-00270-001)
District Judge: Honorable Mark R. Hornak
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 14, 2017
_____

Before: VANASKIE, RENDELL, and FUENTES, *Circuit Judges*

(Filed: January 24, 2018)
_____

OPINION[*]
_____

VANASKIE, *Circuit Judge.*

In this direct criminal appeal, Appellant-Defendant Atiba Warren raises arguments

involving the Fourth Amendment and the Armed Career Criminal Act ("ACCA")

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

following his conviction for being a felon in possession of a firearm. On the Fourth Amendment issue, Warren argues that evidence stemming from a warrantless search of his home should have been suppressed. Upon review, however, we find that the imminent-danger exception to the warrant requirement justified the search, and thus suppression was unwarranted. On the ACCA issue, Warren argues that two of his prior convictions should not have counted as predicate offenses, because they were for Maryland crimes whose definitions he sees as reaching too broadly to count, but a review of Maryland precedents indicates that is not true. We will affirm.

**I.**

On October 23, 2012, Atiba Warren was 32 and living in a Pittsburgh, Pennsylvania house when Police Officer Steven Sywyj came to the house in response to a call of a stabbing. Warren was inside when Sywyj arrived to a "chaotic" scene, with the "bloody" and "barely conscious" victim suffering from a wound and lying on the front porch. (App. 32.) The victim was being tended to by another man.

Medics and other officers arrived a "few minutes" later, at which point the man tending to the victim asked Officer Sywyj if he could enter the home to speak with the victim's family. *Id.* Officer Sywyj said yes, accompanied the man to the front door, and stood at the open door's "threshold" as several individuals congregated inside. *Id.* While standing there, Officer Sywyj saw a third man, later identified as Warren, standing "behind everybody" in the house and holding a handgun "in his right hand at chest level." *Id.* Drawing his own firearm, Officer Sywyj shouted "gun," at which point Warren "disappeared from one doorway and re-emerged a second or two later from a doorway

2

further to the right, sans gun." *Id.* at 33.  Officer Sywyj then ordered Warren and the other occupants to "go outside" and, along with Officer Lance Hoyson, who had been assisting the medics, proceeded to enter the home.  *Id.*  Upon entering the home, Officer Hoyson heard "noises" coming from the second floor, and "[b]elieving people may still be upstairs," ordered any remaining individuals "to exit" the home.  *Id.*  Officer Hoyson and a third officer then proceeded upstairs, where they observed that the noises were originating from a television that had been left on.  No other individuals were found in the home.

While Officer Hoyson was upstairs, downstairs Officer Sywyj observed the gun that Warren had been holding "protruding from under a magazine on a table." *Id.* at 77. Noticing upon inspection that the gun's serial number had been obliterated, Officer Sywyj accordingly placed Warren under arrest.  *See* 18 U.S.C. § 922(k) (prohibiting the possession of a firearm that has moved in interstate commerce and has an obliterated serial number).  Officer Hoyson then came back downstairs, exited the home, and advised Warren of his *Miranda* rights. Warren thereafter admitted the firearm was his.

Warren—who has prior felony convictions—was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  He pleaded not guilty and moved the District Court to prohibit the admission of any evidence—namely the gun—that had been procured from the search of Warren's home.  The District Court denied the motion, and a jury found Warren guilty after trial.

At sentencing, the District Court held that because three of Warren's prior convictions were for crimes that met the definitions of "serious drug offense" or "violent

3

felony" in 18 U.S.C. § 924(e), the typical ten-year mandatory maximum did not apply, and the ACCA's mandatory minimum instead required that he be imprisoned for at least fifteen years. The District Court sentenced him to sixteen years in prison, and Warren appealed.

## II.

The District Court had jurisdiction because Warren was charged with an offense against the laws of the United States. 18 U.S.C. § 3231. We have jurisdiction because Warren appealed from the final decision of the District Court. 28 U.S.C. § 1291.

## III.

Warren contests two aspects of the District Court's handling of his case: the denial of his motion to suppress evidence, and the determination that he had the requisite three prior qualifying convictions to be designated as a "career criminal" and thus subject to a fifteen-year mandatory minimum prison term under ACCA.

## A.

Warren first challenges the denial of his suppression motion. In reviewing a decision on a suppression motion, we review a district court's findings of fact for clear error and its conclusions of law *de novo*. *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014). As applied specifically to our review of a holding that exigent circumstances did or did not exist on a particular occasion, our standards require us to review the actual underlying factual findings for clear error, but we review *de novo* the question of whether those facts created an exigency. *Id.*

4

The Constitution prohibits the government from conducting "unreasonable searches" of "persons, houses, papers, and effects," U.S. Const. amend. IV. The search-and-seizure requirements of the Fourth Amendment also apply against the states, including Pennsylvania, through the Fourteenth Amendment's Due Process Clause. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

Whether a search is "unreasonable" is usually determined by the warrant requirement: it is "*per se* unreasonable" for an officer to conduct a search "outside the judicial process, without prior approval by [a] judge or [a] magistrate judge." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) (alterations in original) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). But "a few specifically established and well-delineated exceptions" to the warrant requirement exist, *id.*, one being the exigent-circumstances exception. *Mallory*, 765 F.3d at 383. Under this exception, exigent circumstances may excuse a police officer's warrantless search, for example, when the officer "reasonably . . . believe[s] that someone is in imminent danger." *Id.* at 384 (quoting *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006)). The crucial word is "imminent," requiring "the existence of a true emergency." *Id.* (quoting *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011)). This imminent-danger, exigent-circumstances exception is adjudged from an objective standpoint; "the subjective intent of the officer is irrelevant." *Id.* at 383 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006)).

Here, at least four aspects of the facts of Warren's case support the District Court's holding that Officer Sywyj could have reasonably believed that he faced an

5

imminent danger—either to himself or to the other individuals present at the scene—immediately prior to making his warrantless search of the house. First, the context of the search and the ambiguity of events: what preceded the search was a bloody stabbing, and Sywyj and the other officers had not yet fully learned the events that led to the stabbing. *See id.* at 386 (noting the presence of a violent offense is a factor tending toward an imminence finding); *see also* (App. 32) (stating that Officer Sywyj was seeking to "interview" the man who tended to the victim); (App. 33) (stating that Officer Hoyson had remained on the scene after the victim had departed in an ambulance "to gather evidence about the stabbing"). Second, "chaos": the District Court noted the scene was "chaos," reasonably heightening Sywyj's concern that further violence might occur. *See Mallory*, 765 F.3d at 386 (listing unsupervised movement of individuals at the scene as a factor tending toward an imminence finding). Third, the gun: Warren was holding a gun, a lethal weapon. *See id.* (listing the presence of an easily-obtainable, usable firearm as tending toward an imminence finding). Fourth, the position in which Warren was holding the gun: the gun was not lying on a table, or holstered on Warren's belt, or even held at Warren's side—Warren was holding it at "chest" level, a position that reasonably suggests Warren may have intended to use the weapon. *See id*. at 386 (listing the easily-obtainable-and-usable-firearm factor). Taken together, these facts support a finding that a reasonable officer could find an imminent danger.

Warren has four fair arguments in his favor, but none command a different result. First, the timing of Sywyj's search is not exactly clear from the District Court's opinion. *See id.* (highlighting timing as a factor for determining imminence). Except for noting

that medics arrived "within a few minutes" of Officer Sywyj's arrival on the scene (App. 32), the opinion does not describe in precise terms how much time passed prior to the warrantless search. Warren argues that we cannot determine imminence without knowing the timing. But despite the lack of precision, the District Court did arrive at a factual finding—it found that the sequence of events occurred in a "compressed period of time." (App. 32 n.3.) Warren has pointed to no evidence to indicate that this compressed-period-of-time factual finding is clear error, so we are bound by it.

Second, Warren argues that Officer Sywyj's mere observation of Warren holding a gun was not probable cause that a crime had been or would be committed. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."). But in imminent-danger cases involving a gun, the probable-cause determination and the exigent-circumstances finding often dovetail together, because it is the possible illegal use of a gun that gives rise to the danger in the first place. That is just what happened here: Officer Sywyj, upon seeing Warren holding a gun at his chest, could have reasonably feared that Warren might illegally discharge his weapon at him or at someone else on the scene. This fear therefore meets both the exigent circumstances and probable cause prongs.

Third, Warren notes that the District Court's opinion contains no discussion of the stabbing assailant, whether he or she had been captured or identified, or whether the house was suspected to contain accomplices. *See Mallory*, 765 F.3d at 386 (factoring in whether the suspect has been apprehended and whether the premises has been secured).

7

But total knowledge of an event is unnecessary, and here the District Court had more than enough evidence from which it could arrive at a finding of imminence: the chaos, bloody stabbing, compressed period of time, and the chest-level gun all support the finding of imminence.

Fourth, Warren analogizes his case to *United States v. Mallory*, where late one night in Philadelphia, police officers chased a suspect carrying a handgun into a four-story family home without a warrant. 765 F.3d at 376–77. After ordering the family outside, the officers methodically searched all four floors of the house, eventually locating the suspect in a locked bathroom and arresting him. *Id*. at 377–78. The gun, however, remained missing. *Id.* at 378. As the police were removing the suspect from the property, officers remembered a spot in the house they had not searched. *Id.* They doubled-back into the house and found the gun. *Id.* On those facts, we held that the gun must be suppressed, because—although the initial search may have been justified—the police had gained "control of the situation" by removing the suspect and the family from the home. *Id.* at 386–87. As a result, any exigent circumstances that once existed had passed. *Id.*

Here, unlike *Mallory*, Warren's gun was discovered prior to officers gaining control of the situation. In *Mallory*, the officers' search had methodically progressed floor by floor, and the gun was found after both the family and the suspect had been removed from the house. Here, however, the gun was found while Officers Sywyj and Hoyson suspected that more individuals remained inside the home. It was not until Officer

8

Hoyson came down from the upstairs, after Sywyj found the gun, that the officers could reasonably be said to have gained control of the situation and eliminated the exigency.

In sum, the context of the scene and the events, when coupled with Officer Sywyj's observation of Warren holding a gun at chest height, supported a reasonable belief that an imminent danger existed to officers and others, justifying the warrantless search until the Officers could gain control of the scene, an event that did not occur until after Hoyson had learned that no one remained in the house. The search was not unreasonable, and suppression was not appropriate.

**B.**

Warren also challenges the application of the ACCA fifteen-year mandatory maximum by arguing that two of his three identified prior convictions cannot serve as predicate offenses. These are questions of law, and we review them *de novo*. *See United States v. Dahl*, 833 F.3d 345, 349 n.4 (3d Cir. 2016).

Typically, a person convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) may be "imprisoned not more than 10 years." 18 U.S.C. § 924(a)(2). But under the ACCA, that ten-year mandatory *maximum* is transformed into a fifteen-year mandatory *minimum* if the person "has three previous convictions by any court . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another." *Id.* § 924(e)(1).

The ACCA goes on to define the two categories of predicate offenses—"violent felonies" and "serious drug offenses." A "violent felony" is any felony that either "has as an element the use, attempted use, or threatened use of physical force against the person

9

of another," or "is burglary, arson, or extortion, [or] involves the use of explosives." *Id.* § 924(e)(2)(B).[1]  A "serious drug offense" is any crime that is either one of several categories of federal drug offenses, or a state drug offense "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." *Id.* § 924(e)(2)(A).

To see whether a particular offense fits one of these definitions, courts typically apply the "categorical approach":  they "focus solely on whether the elements of the crime [that underlie the prior offense] sufficiently match the" ACCA definition for either violent felony or serious drug offense, "while ignoring the particular facts of the case." *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (internal citation omitted).  "The key . . . is elements, not facts." *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013). If even one of the prior-offense crime's elements reaches "more broadly" than the ACCA definition, then "no conviction under that law could count as an ACCA predicate . . . ." *Mathis*, 136 S. Ct. 2248-49.  If the prior offense crime contains alternative elements, some that meet ACCA definitions and some that do not, then a court may examine a limited universe of trial-court documents to determine which alternative element served as the basis for the defendant's conviction. *Id.* at 2249; *see also Shepard v. United States*, 544 U.S. 13, 26 (2005) (listing a few of the documents that may be reviewed).  Criminal

---

[1] 28 U.S.C. § 924(e)(2)(B) also includes a third residual definition for "violent felony"—any felony that "involves conduct that presents a serious potential risk of physical injury to another"—but the residual clause is void for vagueness and may not be constitutionally enforced. *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015).

statutes containing alternative elements are referred to as "divisible" statutes. *Descamps*, 133 S. Ct. at 2281.

### 1. Maryland Robbery

Here, two Maryland prior offenses are at issue. The first is Warren's conviction for robbery, which the District Court found to be divisible and a "violent felony." Warren argues robbery is an indivisible crime in Maryland and cannot be a "violent felony."

Three relevant sections of the Maryland Criminal Code define Maryland's robbery law. Section 3-401 defines robbery as retaining its "judicially determined" common law "meaning" and prescribes a few exceptions. Md. Code Ann. Crim. Law § 3-401. Section 3-402 prohibits robbery and sets forth a mandatory maximum of fifteen years' imprisonment. *Id.* § 3-402. And § 3-403 builds on § 3-402 to prohibit "robbery under § 3-402" if it is committed "with a dangerous weapon," in which case the mandatory maximum prison term is increased from fifteen to twenty years. *Id.* § 3-403.[2]

From this statutory landscape, the parties' arguments frame three undisputed points: First, the United States mounts no argument that a conviction for simple robbery, without § 3-403's armed component, is a "violent felony" in the eyes of the ACCA. The United States instead bases its entire argument on the notion that Maryland's robbery statute is divisible, and that Warren's conviction falls under the armed-robbery portion in

---

[2] The language found in § 3-401 to § 3-403 is an updated and reorganized version of the law that governed Warren's case, but the parties agree that today's language is substantively the same as when Warren was convicted.

11

§ 3-403.[3] Second, Warren concedes that, if Maryland's law is in fact divisible as the United States maintains, then it is clear from the available *Shepard* documents that his robbery conviction was for armed robbery under § 3-403, not simple robbery. Third, if Maryland law is, alternatively, as Warren suggests, just one indivisible offense, then the United States does not dispute that a Maryland robbery conviction—even if it is committed by the means of using a dangerous weapon—cannot serve as an ACCA violent-felony predicate. Given these shared premises, the main dispute between the parties is whether the Maryland robbery statute is divisible. The United States says yes, the dangerous-weapon portion is an alternative element, and Warren says no, the dangerous-weapon portion merely describes an alternative means of committing a robbery and is a factor for sentencing.

We must first separate a crime's legal elements from the means by which the crime is committed. As the Supreme Court has explained, the former are the "'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.'" *Mathis,* 136 S. Ct. at 2248 (quoting Black's Law Dictionary 634 (10th ed. 2014)). "At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant . . . ." *Id.* (internal citation omitted). Under a line of Sixth Amendment cases beginning with *Apprendi*, an "element" may also be defined as any factual finding that would "expose[] the defendant to a greater punishment" than what would otherwise be "authorized by the jury's guilty verdict . . . ." *Hurst v. Florida*, 136

_____

[3] *Cf. United States. v. Redrick*, 841 F.3d 478, 482 (D.C. Cir. 2016) (noting that the United States has taken divergent positions on the Maryland simple-robbery issue in litigation before the Fourth and D.C. Circuits).

12

S. Ct. 616, 621 (2016) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000)).  By contrast, the means by which a crime can be committed relate to the "facts" of a case, "extraneous to the crime's legal requirements," and "need neither be found by a jury nor admitted by a defendant" before the defendant is found guilty.  *Mathis*, 136 S. Ct. at 2248.

Here, Maryland precedent indicates that the dangerous-weapon portion of the Maryland robbery statute is an element of the crime.  Maryland requires its prosecutors to put the dangerous-weapon allegation in the indictment, present it to the jury, and prove it beyond a reasonable doubt.  *See, e.g.*, *Wadlow v. State of Maryland*, 642 A.2d 213, 216 (Md. 1994) (requiring questions involving sentencing enhancements for "circumstances of the offense" to be charged in the indictment, presented to the jury, and subjected to the reasonable doubt standard); *Battle v. State*, 499 A.2d 200, 203 (Md. Ct. Spec. App. 1985) (quoting jury instructions on the dangerous-weapon issue); Md. State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 4:28.1 (2017 ed.) (instructing that for armed robbery, "the State must prove . . . that the Defendant committed the robbery by using a dangerous weapon").  In *United States v. Redrick*, 841 F.3d 478, 483 (D.C. Cir. 2016), the D.C. Circuit recently used this same reasoning to conclude that the dangerous-weapon portion of the Maryland armed robbery statute is an element of the crime under the ACCA.

The dangerous-weapon portion of the Maryland robbery statute is also an "element" under *Apprendi*.  The Sixth Amendment provides criminal defendants with the right to a trial "by an impartial jury."  U.S. Const. amend. VI.  This right, in conjunction

13

with the Due Process Clause, requires that juries decide all questions related to whether a defendant's conduct meets the elemental definitions of a charged crime. *Hurst*, 136 S. Ct. at 621. Thus, the Sixth Amendment, like the ACCA, demands that federal law differentiate between a crime's elements and the means by which the crime may be violated, because any factual finding that goes to an "element" must be found by a jury, and only non-elemental factual findings may be found by a judge. A line of Sixth Amendment cases beginning with *Apprendi* has therefore defined a crime's "elements" as encompassing the factual findings that would increase the permissible range of punishment for the crime. *Hurst*, 136 S. Ct. at 621. Under the Maryland statute, a dangerous-weapon finding increases the available maximum term of imprisonment from fifteen to twenty years. Under *Apprendi*, therefore, the dangerous-weapon portion of the Maryland robbery statute is an element of the crime.

Warren responds with citations to authority that he believes support his view that Maryland robbery is one indivisible crime. He highlights § 3-403's language phrasing its armed-robbery prohibition by reference to § 3-402, instead of laying out a new set of elements. Md. Code. Ann. Crim. Law § 3-403 ("A person may not commit or attempt to commit robbery under § 3-402 of this subtitle: (1) with a dangerous weapon"). And he references several statements from the Maryland Court of Appeals about robbery being a single offense: "In Maryland, robbery is a single common law offense," *Whack v. State of Maryland*, 416 A.2d 265, 266 (Md. 1980); the State's statutory sections on robbery "do not create separate statutory offenses but merely fix the penalties for the one crime of robbery," *id.*; and "[r]obbery with a deadly weapon is not a separate substantive offense,

14

but if the State can prove that a defendant used a deadly weapon during the commission of the robbery, the defendant is subject to harsher penalties," *Conyers v. State of Maryland*, 693 A.2d 781, 796-97 (Md. 1997) (internal citation omitted). But all of these statements, even if taken at their strongest, do not preclude the possibility that Maryland robbery is a single, yet divisible, offense. Also, Warren ignores countervailing language in other Maryland decisions. For example, the Maryland Court of Appeals has stated that "armed robbery and basic robbery" are, "for some purposes," properly regarded as "separate offenses." *Hagans v. State of Maryland*, 559 A.2d 792, 799 (Md. 1989). And the Maryland Court of Special Appeals has described the dangerous-weapon portion of Maryland's robbery law as "requir[ing] proof of an additional element." *Bynum v. State of Maryland*, 357 A.2d 339, 341 (Md. Ct. Spec. App. 1976). Furthermore, it is not Maryland's labels that are dispositive; our inquiry is whether, as a matter of federal law, the deadly-weapon portion of the statute is an "element" of the crime under the ACCA. *Redrick*, 841 F.3d at 483; *see also Johnson v. United States*, 559 U.S. 133, 138 (2010) (stating the "meaning of 'physical force' in [the ACCA] is a question of federal law, not state law"). Maryland's crime of robbery is a divisible offense, with an alternative element for robbery with a dangerous weapon. It is clear from the *Shephard* documents that Warren was convicted of robbery with a dangerous weapon.

Finally, Warren argues that even if Maryland's robbery law is divisible, his armed-robbery conviction still is not a "violent felony" under the ACCA because threats against property alone are sufficient for Maryland robbery but do not constitute "force" under the ACCA. *See* 18 U.S.C. § 924(e)(2)(B) (referring only to the "use, attempted use, or

15

threatened use of physical force against the *person* of another") (emphasis added).  His argument is that he reads the Maryland precedent as including threats that are merely against property.

For support, Warren relies upon two forty-seven-year-old decisions from Maryland's Court of Special Appeals, the State's intermediate appellate court.  First, he cites *Douglas v. State of Maryland*, 267 A.2d 291, 295 (Md. Ct. Spec. App. 1970), where the court stated that robbery does not require a "fear" of "bodily injury at all" and that the fear may relate "to property, as for example, a threat to burn down a house."  Second, Warren points to *Giles v. State of Maryland*, 261 A.2d 806, 807 (Md. Ct. Spec. App. 1970), where the court also noted that robbery could be accomplished by threatening "injury to the person or to property."  In Warren's view, these statements are rule statements that extend the crime of robbery to threats to property, beyond instances of constructive force against a person wherein a threat of bodily injury might be implied from a more specific threat to property.  But we disagree.  The intermediate-appellate court decisions on which Warren relies are not binding on us, *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967), and they are not particularly persuasive given their old age and the lack of support in more recent decisions from either the State's intermediate court or highest court, the Maryland Court of Appeals, *see* Bryan A. Garner et al., *The Law of Judicial of Judicial Precedent* 234 (2016) ("A precedent that has never been cited or affirmed—or that has not been recently cited—is vulnerable to doubt.").

Given that Warren highlights no binding state precedent, our task is to "consider all the data the highest court of the state would use in an effort to determine how the

16

highest court of the state would decide." Richard H. Fallon, Jr., et al., *Hart and Wechsler's The Federal Courts and the Federal System* 570 (6th ed. 2009); *see also U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996) ("[W]e must attempt to predict how that tribunal would rule") (citing *Kowalsky v. Long Beach Township*, 72 F.3d 385, 387 (3d Cir. 1995)). Here, we predict that the Maryland Court of Appeals would refrain from extending its law governing armed robbery crimes to threats made to property that are not likewise accompanied by an explicit or implied threat to a person. Maryland's precedent emphasizes that robbery is, at bottom, based on assault and battery principles, and assault and battery are crimes carried out against people, not property. *See Snowden v. State of Maryland*, 583 A.2d 1056, 1059 (Md. 1991) ("Robbery is a compound larceny. It is a larceny from the person accomplished by either an assault (putting in fear) or a battery (violence)."). "Under Maryland law . . . assault consists of '(1) an attempt to commit a battery or (2) an unlawful intentional act which places another in reasonable apprehension of receiving an immediate battery.' . . . A 'battery,' in turn, 'is any unlawful application of force . . . to the *body* of the victim.'" *Redrick*, 841 F.3d at 485 (quoting *United States v. Coleman*, 158 F.3d 199, 201 (4th Cir. 1998) (en banc) (emphasis added)). The "dangerous weapon" requirement makes the question even easier, because dangerous and deadly weapons "are 'deadly' to humans, not property." *Id.* Thus, Maryland's definition of force for armed-robbery does not extend more broadly than the definition of "force" in the ACCA, and Warren's Maryland robbery conviction may serve as a predicate offense.

17

### 2. Maryland Heroin Distribution

The second offense at issue is Warren's Maryland heroin distribution conviction. Warren did not raise this argument in an objection before the District Court, and so to receive relief on appeal, he must not only demonstrate that the District Court committed an error, he "must also meet the requirements of the plain-error standard by demonstrating the error is clear, prejudicial, and affects the fairness or reputation of the judicial proceeding." *Dahl*, 833 F.3d at 349 n.4 (internal citation omitted).

As mentioned above, to be a "serious drug offense" under the ACCA, the Maryland drug offense must punish conduct "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." 18 U.S.C. § 924(e)(2)(A). Here, Warren focuses on attempted distribution: federal law defines the word "distribute" to mean "to deliver," with deliver in turn meaning "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." 21 U.S.C. § 802(8), (11). Warren says Maryland defines "distribute" more broadly in that Maryland's definition of "distribution" not only covers actual and attempted delivery, but also mere *offers* to deliver. *See United States v. Hinkle*, 832 F.3d 569, 572 (5th Cir. 2016) ("The Government concedes that if Hinkle were convicted of delivering a controlled substance by 'offering to sell' that substance, the crime would not come within the definition of a 'controlled substance offense.'").

But Warren does not offer much in the way of showing that Maryland law actually goes so far to include offers in its definition of deliver. He relies largely on a forty-six-

18

year-old Maryland Court of Special Appeals decision, *Rosenberg v. State of Maryland*, where the court found that the word "distribute" includes "offer" because "distribute" includes "delivery," "delivery" includes "sale," and "sale" includes "offer." 276 A.2d 708, 710 n.1, 711 (Md. Ct. Spec. App. 1971). We suspect that *Rosenberg*'s convoluted and attenuated reasoning reaches the wrong result at least in extending the definition of "distribute" to include an "offer," and the source of the confusion appears to be its interpretation of language in Maryland's definition of "deliver." That definition extends to "actual, constructive, or attempted transfer[s]" regardless of "whether or not remuneration is paid." Md. Code Crim. Law Code. § 5-101(i) ("Deliver"). Extending the definition of delivery to instances where "remuneration" is not paid, however, is not equivalent to extending the definition to a mere offer; rather, the without-remuneration language simply means that an attempted transfer is still attempted even if money does not change hands. An offer is something even less than that, because all it requires is a manifestation of willingness by one party to enter into a bargain, regardless of whether the other party wants to join in. *See* Restatement (Second) of Contracts § 24 ("Offer Defined"). Attempted transfer implies that a bargain has been reached. We think the Maryland Court of Appeals would agree.

Warren also points to a jury-instructions treatise, which states that a defendant has "distributed a controlled dangerous substance if [he or she has] sold the substance," and the definition of "sale" "includes exchanging, bartering, or *offering* [the substance] for money." David E. Aaronson, Maryland Criminal Jury Instructions and Commentary

19

§ 7.46 (2017 ed.) (emphasis added). But the only source that Professor Aaronson cites for the "offer" language is *Rosenberg*, rendering it just as problematic of a source.

Finally, even if we found Warren's "offer" position to be a correct reading of the law, the plain error standard of review would still not permit us to award appellate relief, because the error would be at best founded on murky case law. It would be far from "plain." Accordingly, Warren is not entitled to relief with respect to his challenge to his Maryland heroin conviction as an ACCA predicate offense.

## V.

For the foregoing reasons, we will affirm the District Court's order denying Warren's suppression motion and the District Court's sentencing order.