**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-1530, 23-2002 & 23-3221
_____

UNITED STATES OF AMERICA

v.

KEVIN COLES,
                Appellant in No. 23-1530


UNITED STATES OF AMERICA

v.

NICHOLAS PREDDY,
                Appellant in No. 23-2002


UNITED STATES OF AMERICA

v.

JOHNNIE JENKINS-ARMSTRONG,
                Appellant in No. 23-3221
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Nos. 1:16-cr-00212-001, 1:16-cr-00212-008 & 1:16-cr-00212-009)
District Judge:  Honorable Christopher C. Conner
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 29, 2024
_____

Before:  HARDIMAN, PHIPPS, and FREEMAN, *Circuit Judges*

(Filed: April 7, 2025)

_____

OPINION[*]

_____

**PHIPPS**, *Circuit Judge*.

This consolidated appeal addresses challenges by three of many coconspirators who dealt drugs and/or participated in a triple murder designed to retaliate against an informant. The appellants here – Kevin Coles, Johnnie Jenkins-Armstrong, and Nicholas Preddy – were prosecuted in the District Court, *see* 18 U.S.C. § 3231, and they now dispute their convictions and/or their sentences on various grounds. For the reasons below, we will affirm each of the challenged judgments and disputed sentences.

In March 2016, Wendy Chaney, who lived in Hagerstown, Maryland, was arrested for possessing controlled substances discovered in her car following a traffic stop. Based on the quantity of drugs recovered from a search incident to her arrest, Chaney faced criminal liability for more serious drug offenses and began cooperating with law enforcement at a police station in Montgomery County, Maryland. Over the next three months, she provided information about several drug traffickers in the Hagerstown area. One of the persons whom she outed was Kevin Coles, with whom she previously had a relationship.

Coles, himself subject to an outstanding New York administrative warrant issued by the New York State Division of Parole for violating the conditions of his probation on an arson conviction, began to suspect that Chaney was cooperating with law enforcement and providing information about him. He directed his then-girlfriend to find out whether

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Chaney had any pending criminal charges in Maryland and therefore a motive to cooperate with authorities.

By June 2016, Chaney had become confident that Coles knew that she was an informant and that he was planning to kill her. On June 23, Chaney told a police officer that Coles and others knew that she was cooperating. Over the next two days, she told at least two other people, including her son, that Coles would try to kill her.

Chaney's fears were well founded. The plot against her took shape on June 25. That day, a gang member with whom she was in a romantic relationship at the time induced her to go to a farmette in Mercersburg, Pennsylvania, owned by another drug dealer, Phillip Jackson. Meanwhile, Coles sent two men, one of whom was Jerell Adgebesan, to Baltimore, to recruit members of the Black Guerilla Family gang to help with the murder. The would-be recruits were told they could take the $20,000 in cash, along with drugs and guns, that they would find at the farmette as compensation for killing Chaney. That recruiting trip was successful, and after the gang members arrived in Hagerstown, there was a meeting, without Coles present, to plan Chaney's murder.

Again without Coles, several gang members, including Johnnie Jenkins-Armstrong and Nicholas Preddy, then drove to the farmette in Mercersburg. They found Chaney outside the barn and two men inside: Jackson, who owned the property, and Brandon Cole. The gang members subdued Chaney and the two men and held the three at gunpoint and zip-tied them. Some gang members then searched the property for the promised bounty. Finding nothing, they went back to the barn and beat Jackson unconscious. Not satisfied to have come up empty-handed, they next forced Chaney, still zip-tied, to accompany them around the property and search again for the loot. While that was taking place, Jackson regained consciousness, and despite being zip-tied, he charged at the gang members

3

guarding him. He was shot in the head. So was the other detained man, Brandon Cole. When the gang members who had sought their reward returned with Chaney and no loot, they found Jackson and Cole – both shot in the head. Then, two gang members, one of whom was Jenkins-Armstrong, shot Chaney. The gang members then doused the three bodies with gasoline and lit them on fire.

When the Pennsylvania State Police arrived, they found Chaney and Cole dead. But Jackson was still alive. He was airlifted to a hospital, where he died hours later.

## A. Kevin Coles

Before the murders, Coles made no secret of his intention to eliminate Chaney. He told multiple fellow gang members that Chaney "was running her mouth too much," so "she had to go down." Coles Day 8 Trial Tr. 109:12–13 (Coles Suppl. App. 1159); *see also id.* 110:11–16 (Coles Suppl. App. 1160). And the day of the murder, he told his then-girlfriend that "[Chaney] was going to be killed that night" because he was "tired of her running her mouth, starting up trouble." *Id.* 119:12–14 (Coles Suppl. App. 1169).

After so informing his then-girlfriend, Coles made sure she had an alibi. He told her to go to the movies and how long to stay. He confirmed that she had done so by having her send him photographs.

Coles did not have a solid alibi himself. His then-girlfriend did not know where he was that night, and he arrived home drunk after midnight. After he went to sleep, he said he was sorry again and again.

Coles later told his then-girlfriend about his involvement in the murders. He provided her with the specifics of the killings before those details were public. He also revealed to her the motive for the murder: Chaney was killed "to shut people up, to tie them

4

up and then torture them to teach them to be quiet, to teach them a lesson." *Id.* 124:16–18 (Coles Suppl. App. 1174).

Four days after the murders, Pennsylvania law enforcement officers investigating the triple murder applied for two electronic search warrants for Coles' cell phone. The Court of Common Pleas in Franklin County, Pennsylvania, granted those requests. The resulting electronic surveillance orders, issued pursuant to 18 Pa. Cons. Stat. §§ 5743 and 5773, required that the telephone carriers disclose, among other things, Coles' internet and data usage, the cell site location information for the phone for the prior thirty and next sixty days, logs of calls and text messages, and the contents of text messages.

With the benefit of the cell site location information, Pennsylvania police were able to identify Coles' likely location – a motel in Hagerstown. They forwarded that information to the Maryland State Police, who were aware of Coles' outstanding administrative warrant from New York.

On July 7, 2016, Maryland law enforcement officers went to the motel, intending to apprehend Coles in his room. Before they approached, they observed Coles leave the building with a large white garbage bag. He waited at the motel's entrance for several minutes until a crossover SUV pulled up, and he entered through the rear passenger-side door. Maryland police stopped the vehicle in the motel parking lot, ordered Coles out, and arrested him. They found a cell phone on his person, another in the vehicle, and they saw a third fall to the ground as Coles exited the vehicle.

One of the other passengers in that vehicle provided incriminating information about Coles. She told the officers that she had seen Coles with a gun on multiple occasions. She also reported that the night before his arrest, she and Coles had been in that same crossover SUV when Hagerstown police officers approached. She related that Coles had provided a

false name and fled the scene. Relying on those statements, along with information provided by Pennsylvania law enforcement, the Maryland officers successfully applied for a warrant to search the crossover SUV. In executing that warrant, they discovered several cell phones, a tablet, a trash bag containing clothing, and two bags containing approximately twenty grams of heroin.

The recovered electronic devices contained evidence implicating Coles in Chaney's murder. Searches of those devices revealed text messages from Coles describing Chaney as a "dead issue" the day before her murder, Coles Day 10 Trial Tr. 40:17 (Coles Suppl. App. 1503), as well as messages from Coles to his then-girlfriend ensuring that she had an alibi the night of the murders. One of the phones also contained post-murder internet searches for articles about the murders.

Even after Coles' arrest, he made no secret of his connection to the triple homicide. He discussed his role in the murders in a call from jail. He told one inmate that "he had to do what he had to do." Coles Day 9 Trial Tr. 28:4–9 (Coles Suppl. App. 1259). He told another inmate he "knew how to get some dudes from Baltimore" to kill Chaney. *Id.* 62:22–25 (Coles Suppl. App. 1293). He boasted to another that he had hidden his involvement in the killings, and he bragged to yet another that he had ordered Chaney killed for acting as an informant.

In addition to investigating Coles for the murders, law enforcement officers looked into his drug trafficking. They learned that Coles had twice sold heroin leading to overdoses – once about six months beforehand and once again the day before his arrest.

On August 3, 2016, a federal grand jury in Pennsylvania indicted Coles, and through a later superseding indictment, he was charged with sixteen counts related to the murders and his drug trade. Coles moved to suppress any evidence gathered incident to his arrest

6

in Maryland on the grounds that there was no probable cause to arrest him and that the administrative warrant was impermissibly used as a search warrant. He also moved to suppress the evidence discovered pursuant to the two Pennsylvania electronic surveillance orders on the grounds that those warrants were illegal under Pennsylvania law and that they were issued without probable cause. After holding evidentiary hearings on those motions, the District Court denied them.

Coles later moved to dismiss twelve of the sixteen counts in the third superseding indictment against him. As part of that motion, he disputed the four counts premised on the commission of a crime of violence, *see* 18 U.S.C. § 924(c), (j), (o), on the theory that none of the identified predicate offenses qualified as crimes of violence. The District Court rejected that contention, reasoning that the two identified predicate offenses – Hobbs Act robbery, *see id.* § 1951(a), and killing a federal witness, *see id.* § 1512(a)(1) – both qualified as crimes of violence.

The case went to trial in April 2022, and it lasted about three weeks. Coles raised several objections to the Government's evidence. He challenged the Government's use of prior out-of-court statements by Yolanda Diaz, the daughter of one of the Government's witnesses and the sometimes-girlfriend of Coles' partner in drug-dealing. On direct examination, the Government asked Diaz whether she recalled an interview about the case with the Drug Enforcement Agency on January 24, 2017 – more than five years before her April 20, 2022, testimony in court. She said she did not; it had "been so long." Coles Day 7 Trial Tr. 217:15 (Coles App. 293). So, in an effort to refresh her recollection, the Government began to read passages of the DEA agent's report of that interview and, over defense counsel's objection, asked if she recalled each statement. Diaz admitted to making some of the statements, and she averred that they were in fact true. But as the prosecution

7

continued that same approach for statements attributed to her in the report that suggested Coles' guilt, she denied making them and denied their truth. The prosecution nonetheless continued the same approach, which led to Diaz denying that she said that Coles had access to multiple firearms, denying that he was part of the drug trafficking activities at issue here, denying that she said that Wendy Chaney was one of his runners, and denying that Chaney was one of his runners. Although the District Court overruled Coles' objections, it did issue a limiting instruction for the prior contradictory statements, as requested by Coles, that the jury consider Diaz's prior statements to the DEA only to assess her credibility, not for their truth.

For his own defense at trial, Coles attempted to shift the blame to a codefendant. To support his theory, he sought to introduce a prior out-of-court statement that Chaney's mother gave to a police officer when she was questioned about Chaney's murder. The Government objected on the grounds that the statement was hearsay and not subject to any exceptions, and the District Court sustained that objection.

The jury returned guilty verdicts on all sixteen counts. Coles contested that outcome through a motion for acquittal under Federal Rule of Criminal Procedure 29(c), in which he argued that the evidence was insufficient to support a conviction beyond a reasonable doubt. The District Court granted that motion for one count – possession with intent to distribute heroin and cocaine base – but otherwise denied it.

In sentencing Coles, the District Court set the sentences for eight of the offenses to run concurrently and the sentences for the remaining seven offenses to run consecutively to each other as well as to the concurrent sentences. The concurrent sentences consisted of

8

four life sentences,[1] three 240-month sentences,[2] and one 238-month sentence.[3]  The consecutive sentences consisted of three life sentences,[4] three 120-month sentences,[5] and one 60-month sentence.[6]  Altogether, Coles was sentenced to four consecutive lifetimes and an additional consecutive 420 months in prison.

After filing a notice of appeal to invoke this Court's appellate jurisdiction, Coles now challenges several of the District Court's rulings.  *See* 28 U.S.C. § 1291.  He contests the denials of his suppression motions; the rejection of his motion to dismiss the indictment; the evidentiary rulings at trial with respect to Diaz and Chaney's mother; and the partial denial of his post-trial motion for acquittal.  For the reasons below, each of those arguments fail.

1. *The District Court Did Not Err in Denying Coles' Motion to Suppress Evidence Seized in a Search Incident to His Arrest.*

Coles disputes the District Court's denial of his motion to suppress evidence obtained in effectuating the outstanding administrative warrant.  He argues, as he did in District Court, that the warrant – issued by the New York State Division of Parole rather

---

[1] He received life sentences for conspiracy to commit murder-for-hire, *see* 18 U.S.C. § 1958; conspiracy to kill a federal witness, *see id.* § 1512(k); conspiracy to distribute and possess with intent to distribute one hundred grams or more of heroin, *see* 21 U.S.C. §§ 841(a)(1), 846, and possessing heroin with intent to distribute and causing serious bodily injury, *see id.* § 841(a)(1) and (b)(1)(C).

[2] The 240-month sentences were for conspiracy to commit Hobbs Act robbery, *see* 18 U.S.C. § 1951(a); Hobbs Act robbery, *see id.*; and conspiracy to use a firearm during a crime of violence resulting in death, *see id.* § 924(o).

[3] The 238-month sentence was for possessing heroin, cocaine base, and cocaine hydrochloride, *see* 21 U.S.C. § 841(a)(1).

[4] These life sentences were for three counts of killing a federal witness, *see* 18 U.S.C. § 1512(a)(1)(C).

[5] The 120-month sentences were for three counts of discharging a firearm during a crime of violence resulting in death, *see* 18 U.S.C. § 924(j).

[6] The 60-month sentence was for possessing a firearm in furtherance of drug trafficking, *see* 18 U.S.C. § 924(c).

than a court – was impermissibly used as a search warrant and consequently any information obtained as a result of his arrest was acquired unconstitutionally. The premise for Coles' argument is a principle articulated in *Abel v. United States*, 362 U.S. 217 (1960), that "[t]he deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts." *Id.* at 226. That principle stands in contradistinction to much of Fourth Amendment jurisprudence, which evaluates police action from an objective perspective – not based on an officer's subjective rationale.[7] But *Abel*, like this case, involved an *administrative* warrant, and so under the *Abel* principle, it is permissible to consider subjective motives to determine whether the officers intended to exceed the legitimate bounds of the administrative warrant. Even still, to violate the *Abel* principle requires a showing of "bad faith," *viz.*, that the warrant was used for "entirely illegitimate purposes." *Id.* And in *Abel*, such a showing of bad faith could not be made because the use of the warrant, whatever else it achieved, was a "bona fide preliminary step in a deportation proceeding." *Id.* at 230.

As in *Abel*, there is no evidence of bad faith here. The Maryland law enforcement officer who stopped Coles outside of the motel testified that he did so only to effectuate the administrative warrant and Coles' extradition to New York:

> Q: And the only reason that you stopped that car was because Kevin Coles was in it and you believe that Kevin Coles would be extradited by New York, is that right?

---

[7] *See generally Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (describing Fourth Amendment reasonableness as "predominantly an objective inquiry" because "the Fourth Amendment regulates conduct rather than thoughts" and explaining that an objective inquiry "promotes evenhanded, uniform enforcement of the law" (first quoting *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000); then citing *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000); and then citing *Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004))); *Whren v. United States*, 517 U.S. 806, 812 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.").

A: Yes.

Suppression Hr'g Tr. 16:4–7 (Coles App. 425). On the basis of that testimony, and even though, as Coles points out, the Maryland police never extradited Coles to New York after seizing him, it was not clear error for the District Court to conclude that the *Abel* principle was not violated here.[8]

Coles presses his point further by contending that the motivations of the Pennsylvania police also matter. They were interested in Coles as a suspect for the murders, and they shared his likely location with the Maryland police. So, Coles asserts, the Pennsylvania officers were also responsible for the misuse of the administrative warrant, and their subjective motives were not related to the enforcement of the administrative warrant.

Coles overreads *Abel*. Although *Abel* allows an inquiry into the potential bad faith of officers who execute administrative warrants, it was careful not to undermine the "rightful cooperation" between law enforcement agencies. *Abel*, 362 U.S. at 228. Thus, *Abel* does not stand for the proposition that bad faith arises when one law enforcement agency has a different, but independently legitimate, interest in facilitating the execution of an administrative warrant by another. And here, where there is no question that the Pennsylvania police were suspicious about Coles' involvement in the murders, the subjective motives of the Pennsylvania police do not taint the effectuation of the administrative warrant by the Maryland officers, who had independent and subjectively

---

[8] *See generally United States v. Mallory*, 765 F.3d 373, 381 (3d Cir. 2014) (holding that a district court's factual findings in deciding a suppression motion are reviewed for clear error); *Marshak v. Treadwell*, 595 F.3d 478, 488 (3d Cir. 2009) (explaining that under clear-error review, a court "accept[s] the ultimate factual determination of the fact-finder unless that determination . . . either (1) [is] completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data" (internal quotation marks omitted) (quoting *Frett-Smith v. Vanterpool*, 511 F.3d 396, 400 (3d Cir. 2008))).

11

reasonable grounds for locating and detaining Coles. Accordingly, the District Court did not err in denying Coles' suppression motion.

2. *The District Court Did Not Commit Any Error in Denying Coles' Motion to Suppress the Data from His Cell Phones.*

Coles also argues that the electronic information from his cell phones, which included the cell site location information and his text messages, should have been suppressed.

He starts by identifying potential violations of Pennsylvania law in the issuance of the electronic surveillance orders under Sections 5743 and 5733 of Title 18 of the Pennsylvania Consolidated Statutes. According to Coles, the Court of Common Pleas should not have issued those orders because they were overbroad in scope and duration.

But suppression under the exclusionary rule is a remedy for violations of federal constitutional rights. *See United States v. Rickus*, 737 F.2d 360, 363–64 (3d Cir. 1984). *See generally Herring v. United States*, 555 U.S. 135 (2009). And so, the exclusionary rule does not apply to failures to follow state procedures when those procedures are not constitutionally required. *See United States v. Bedford*, 519 F.2d 650, 654 n.1 (3d Cir. 1975). Here, without an argument from Coles that those alleged violations of Pennsylvania law were themselves of constitutional moment, there was no basis for applying the exclusionary rule as a remedy for those alleged violations.

Apart from his reliance on Pennsylvania law, Coles argues that both warrants violated the Fourth Amendment because they were not supported by probable cause. *See Carpenter v. United States*, 585 U.S. 296, 309–10 (2018) (holding that gathering cell site location information constitutes a search under the Fourth Amendment). But an impartial magistrate issued the warrants, and as a general rule, that prevents application of the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 922–23 (1984). And the good-

12

faith exception applies because the officers complied with then-existing binding precedent. *See United States v. Goldstein*, 914 F.3d 200, 204 (3d Cir. 2019) (applying the good-faith exception to a pre-*Carpenter* collection of cell site location information).

To avoid that outcome for the § 5773 warrant, through which law enforcement obtained Cole's cell site location information, Coles invokes the *Franks* exception. That exception applies when an affidavit in support of the search warrant contains a "deliberate falsehood or . . . reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). He argues that there were two material omissions in the affidavit in support of the warrant: it did not reveal (a) that one of the human sources of information was also a prime suspect in the homicides or (b) that the same source had failed a polygraph test. But Coles fails to provide evidence that the affiant either knew or had reason to know of those two facts at the time he signed the affidavit. And without any evidence of deliberate falsehood or reckless disregard of the truth, Coles cannot satisfy the *Franks* exception.

### 3. *The District Court Did Not Err in Refusing to Dismiss Counts Three Through Six of the Third Superseding Indictment.*

Coles also contests a portion of the District Court's order that denied his motion to dismiss the third superseding indictment. Counts three through six of that indictment charged Coles with the use of a firearm during or in relation to a crime of violence, *see* 18 U.S.C. § 924(c), the killing of a person with a firearm in the course of using a firearm during or in relation to a crime of violence, *see id.* § 924(j), and conspiracy to discharge a firearm during or in relation to a crime of violence, *see id.* § 924(o). Each of those charges identified two predicate offenses of violence: Hobbs Act robbery, *see id.* § 1951(a), and killing a federal witness, *see id.* § 1512(a)(1). Coles now argues that Hobbs Act robbery is not a crime of violence, and from there he posits that he should not have been indicted under § 924(c) at all. But his contention is incomplete: § 924(c) requires only *a* predicate

13

crime of violence. *See id.* § 924(c)(1)(A) (governing using or carrying a firearm "during and in relation to *any* crime of violence" (emphasis added)). So, to demonstrate that his indictments under § 924(c) were improper, Coles would have to show that both predicates – Hobbs Act robbery and killing a federal witness – are not crimes of violence. And he has made no attempt to make that showing with respect to killing a federal witness. Given the scope of his arguments, he cannot show that the District Court erred in denying his motion to dismiss those counts.

    4. *The District Court Did Not Abuse Its Discretion in Allowing Yolanda Diaz to Testify.*

Coles also contests the District Court's rulings allowing the Government to impeach Yolanda Diaz on direct examination through the use of statements attributed to her in a DEA report. Coles argues that the Government's true motive in reciting the DEA report was not to impeach Diaz but rather to use the report as "an impermissible back door to get otherwise inadmissible hearsay in front of the jury." Appellant Coles Opening Br. 59.

The purpose for offering evidence is often critical to its admissibility. *See generally* Fed. R. Evid.; 1 McCormick on Evid. § 51 (9th ed. 2025). And with respect to impeaching a witness, although, as a general matter, a party may impeach its own witness, *see* Fed. R. Evid. 607, this Court has made clear that impeachment may not be done for the purpose of evading the hearsay rules:

> It is well established . . . that witnesses may not be called for the purposes of circumventing the hearsay rule by means of Rule 607.

*United States v. Sebetich*, 776 F.2d 412, 429 (3d Cir. 1985). Thus, to succeed on the argument he makes on appeal, Coles must demonstrate that the Government attempted to impeach Diaz as a means of evading the hearsay rules.

Coles has not made that showing. Under questioning, Diaz admitted that she made many of the statements in the report and that they were true. But when it came to the Government's questions regarding her purported statements about drugs and guns, she denied making all of them. Thus, the impeachment was necessarily line by line: if Diaz would have admitted that she had made a statement about guns or drugs, that would have been beneficial to the prosecution, and if she did not, then that was grounds for doubting her credibility. As the District Court remarked, it was a "fair examination by the prosecution." Coles Day 7 Trial Tr. 225:1 (Coles App. 301). That conclusion was not an abuse of discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994) ("A district court's ruling on admissibility of evidence is reviewed for abuse of discretion . . . .").[9]

5. *The District Court Did Not Abuse Its Discretion by Excluding Out-of-Court Statements Made by Chaney's Mother.*

Coles also renews another of his evidentiary challenges at trial: his request to admit an out-of-court statement by Chaney's mother, which he claims would have shifted blame to one of his codefendants. Coles does not contest that the statement constitutes hearsay; instead, he argues that it should have been admitted under the residual hearsay exception. *See* Fed. R. Evid. 807. One of the required showings under that exception is that the hearsay statement be "supported by sufficient guarantees of trustworthiness." *Id.*

---

[9] Coles argues for the first time on appeal that the inquiries were needlessly cumulative, *see* Fed. R. Evid. 403, but that fails under the first prong of plain-error review – whether there was an error, analyzed under an abuse-of-discretion standard for these evidentiary rulings. *See United States v. Adair*, 38 F.4th 341, 355–56 (3d Cir. 2022); *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) ("Evidentiary rulings are reviewed for abuse of discretion . . . ."). It would not have been an abuse of discretion to allow, over a cumulativeness objection, the questioning about the *different* statements in the DEA report, especially since Diaz admitted she made some statements attributed to her and denied making others.

15

807(a)(1). To meet that standard, Coles argues that the statement is reliable because it was made just days after the murder and Chaney's mother would have been motivated to provide an accurate account to a law enforcement officer seeking to solve her daughter's murder. But the residual hearsay exception is to be used "only rarely, and in exceptional circumstances," *United States v. Turner*, 718 F.3d 226, 233 (3d Cir. 2013) (citations omitted), and it requires "*exceptional* guarantees of trustworthiness," *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978) (emphasis added). Although there were some reasons to trust the substantive reliability of Chaney's mother's statements, the District Court did not abuse its discretion in concluding that the statements by Chaney's mother did not satisfy the demanding standard for the residual hearsay exception.

*6. Coles' Challenges to the Denial of His Motion for Acquittal Lack Merit.*

Coles' final challenge is to the sufficiency of the evidence. He argues that he was found guilty by association and that the jury's verdict as to fourteen of the fifteen counts (everything except possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)) should be set aside.

In challenging the counts related to the triple murder and witness tampering, Coles makes no headway. The jury heard that Coles told multiple people that Chaney had to be disposed of for informing. There was also evidence that Coles told his then-girlfriend to check whether Chaney had pending charges in Maryland and instructed her to create an alibi for the night of the murders. And there was testimony that on the night of the murders, he came home after midnight, repeatedly "saying he was sorry in his sleep." Coles Day 8 Trial Tr. 123:2–8 (Coles Suppl. App. 1173). Moreover, the jury heard that Coles told people that Chaney was killed to teach a lesson and that he discussed his role in the murder in a call from jail. In addition, there was evidence that, while incarcerated, Coles told one

16

inmate that he knew how to hire killers in Baltimore, another that he had hidden his involvement, and a third that he had ordered Chaney killed for informing.

Together, those pieces of evidence provide ample support for a rational juror to find that Coles wanted Chaney dead to prevent her from communicating with federal law enforcement, that he conspired in her killing, and that he hid his involvement.

Coles' efforts at second-guessing the jury's verdict on the drug charges are similarly meritless. Viewed in the light most favorable to the prosecution, there was no shortage of evidence to support the conclusion that Coles conspired to distribute heroin and intended to distribute heroin, causing serious bodily injury. A woman testified that she overdosed after taking heroin from Coles and his partner. There was also evidence that two people who had bought heroin from Coles and his partner shared the heroin with an acquaintance who nearly died from the resulting overdose. The jury also heard that both overdose victims were revived with Narcan. In short, there was sufficient evidence to support the two drug convictions.

For these reasons, on *de novo* review of the record in the light most favorable to the prosecution, a rational trier of fact could have convicted Coles of each of those offenses. *See United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).

## B. Johnnie Jenkins-Armstrong

Johnnie Jenkins-Armstrong, who was convicted and sentenced for his involvement in the events surrounding Chaney's murder, also now appeals. He was nineteen at the time he attended the meeting in Hagerstown to plan the murder. He also traveled to the Pennsylvania farmette with a firearm, forced a zip-tied Chaney to look for valuables, and shot her. For those actions, a federal grand jury in Pennsylvania indicted him on thirteen counts.

17

Instead of proceeding to trial, Jenkins-Armstrong entered into a plea agreement. In accordance with that agreement, Jenkins-Armstrong pleaded guilty to two offenses – one count of Hobbs Act robbery, *see* 18 U.S.C. § 1951(a), and one count of use and discharge of a firearm "during and in relation to a[] crime of violence," *id.* § 924(c). Because Jenkins-Armstrong had not previously been charged with a § 924(c) offense, he agreed to waive an indictment for that count, and the information which charged him with the § 924(c) offense identified the predicate offense as Hobbs Act robbery, *see id.* § 1951(a). In return, the Government agreed to drop the other charges against him.

The plea agreement did not include any promise by the Government to recommend a particular sentence, *cf.* Fed. R. Crim. P. 11(c)(1)(B), or to agree to a particular sentence, *cf. id.* 11(c)(1)(C). Instead, the Government expressly reserved the right to recommend the maximum sentence allowed by law, which was life imprisonment. *Cf. id.* 11(c)(1)(A).

Consistent with that reservation of rights, at sentencing, the Government advocated for the maximum penalty for the § 924(c) count – life imprisonment – despite that being above the Guidelines recommended sentence of 360 months.

At sentencing, the District Court, as required by statute, *see* 18 U.S.C. § 924(c)(1)(D)(ii), imposed consecutive sentences for the two counts. For Hobbs Act robbery, *see id.* § 1951(a), it sentenced Jenkins-Armstrong to 240 months' imprisonment. And for the § 924(c) offense, in agreement with the Government's position, the District Court imposed a life sentence.

Through a notice of appeal, Jenkins-Armstrong invoked this Court's appellate jurisdiction to raise two challenges. *See* 28 U.S.C. § 1291; 18 U.S.C. § 3742. First, he argues that the District Court abused its discretion in imposing the life sentence because it did not meaningfully account for the mitigating circumstances he presented. Second, he

18

contends that Hobbs Act robbery, *see* 18 U.S.C. § 1951(a), does not constitute a 'crime of violence,' making his § 924(c) conviction for the use and discharge of a firearm during or in relation to a crime of violence invalid as a matter of law.

*1. The Sentence Is Not Procedurally Unreasonable.*

The standard for appellate review of a challenge to the procedural reasonableness of a sentence depends on whether the argument was preserved. And here, if Jenkins-Armstrong did raise the argument in District Court, then the ruling would be reviewed for an abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 49 (2007) (holding that sentencing decisions are reviewed for abuse of discretion). If he did not, then he must satisfy the four-part plain-error standard. *See Puckett v. United States*, 556 U.S. 129, 133–34 (2009) (holding that objections to sentencing proceedings that are not preserved are reviewed for plain error); *United States v. Flores-Mejia*, 759 F.3d 253, 258 (3d Cir. 2014). Either way, plain error's first step – evaluating whether an error occurred – "uses the standard of review that would have applied had the argument been preserved," so Jenkins-Armstrong must demonstrate that the District Court abused its discretion. *United States v. Adair*, 38 F.4th 341, 356 (3d Cir. 2022).

Relying on an error-by-omission theme, Jenkins-Armstrong attempts to make that showing. He contends that the District Court abused its discretion by not meaningfully considering mitigating factors when it sentenced him to life in prison. *See United States v. Friedman*, 658 F.3d 342, 359 (3d Cir. 2011) (explaining that "district courts should engage in 'a true, considered exercise of discretion . . . including a recognition of, and response to, the parties' non-frivolous arguments'" (quoting *United States v. Jackson*, 467 F.3d 834, 841 (3d Cir. 2006))); *accord United States v. Merced*, 603 F.3d 203, 215 (3d Cir. 2010). He identifies several pieces of mitigating evidence that he claims the District Court did not

consider: that he was born addicted to cocaine; that his mother was addicted to crack cocaine; that he grew up without a strong attachment to a primary caregiver; that his father was killed when he was three; that he attended at least seven different schools; that he grew up in a violent and impoverished neighborhood; and that he had joined the Black Guerilla Family in prison for protection.

The District Court was not persuaded by those mitigating factors, but that alone does not mean that it failed to give them meaningful consideration. *See United States v. Seibert*, 971 F.3d 396, 401–02 & n.4 (3d Cir. 2020) (distinguishing the procedural error of "ignor[ing] the § 3553(a) factors" from the substantive error of affording "inadequate weight" to them), *amended by* 991 F.3d 1313 (3d Cir. 2021); *United States v. Bungar*, 478 F.3d 540, 546 (3d Cir. 2007) ("[A] district court's failure to give mitigating factors the weight a defendant contends they deserve [does not] render[] the sentence unreasonable."). To the contrary, the District Court explained that it "read very carefully all of the materials [Jenkins-Armstrong] submitted," including "the character reference letters[ and] the mitigation report" provided by defense counsel. Jenkins-Armstrong Sent'g Hr'g Tr. 15:8–11 (Jenkins-Armstrong JA349). Moreover, it "carefully studied the trial transcripts" and became "very familiar with the facts of Mr. Jenkins-Armstrong's individual case[ and] his background." *Id.* 26:23–27:2 (Jenkins-Armstrong JA360–61). And after considering those mitigating factors, it concluded "that the only appropriate sentence in this case," involving the "deliberate premeditated murder of a federal witness and the collateral murders of two innocent individuals," was life in prison. *Id.* 29:17–19, 30:5–11 (Jenkins-Armstrong JA363–64). Thus, the District Court did not abuse its discretion in so sentencing Jenkins-Armstrong.

### 2. *Jenkins-Armstrong Has Not Provided a Persuasive Basis for Setting Aside His § 924(c) Conviction.*

The predicate crime of violence for Jenkins-Armstrong's § 924(c) conviction – for which he received his life sentence – was a conviction under the Hobbs Act robbery statute, *see* 18 U.S.C. § 1951(a). Jenkins-Armstrong now attacks his § 924(c) conviction on the ground that under the categorical approach, a conviction under the Hobbs Act robbery statute is not a crime of violence because it does not have as an element "the use, attempted use, or threatened use of physical force." *United States v. Taylor*, 596 U.S. 845, 850 (2022) (quoting 18 U.S.C. § 924(c)(3)(A)).

The three challenges he presents are not successful. His first two arguments assert that completed Hobbs Act robbery is not a categorical match with a 'crime of violence' as defined in § 924(c)(3)(A) because it may be committed by threatening economic harm or *de minimis* force against tangible property. But those contentions cannot be squared with this Court's holding in *United States v. Stoney*, 62 F.4th 108 (3d Cir. 2023), that completed Hobbs Act robbery categorically satisfies the elements clause in § 924 for a crime of violence. *See id.* at 111, 114.

Jenkins-Armstrong's final contention rests on the premise that the Hobbs Act robbery statute is indivisible. From there, he reasons that after the Supreme Court held in *United States v. Taylor* that a conviction under the attempt provision of the Hobbs Act robbery statute, *see* 18 U.S.C. § 1951(a), does not qualify as a § 924(c) predicate offense, *see Taylor*, 596 U.S. at 851, no conviction for Hobbs Act robbery can meet the definition of 'crime of violence.' But that asks too much: if the Hobbs Act robbery statute, 18 U.S.C. § 1951(a), *were* indivisible, then there would have been no reason for the Supreme Court to have considered only the attempt prong – it could have looked at the least culpable conduct under the statute or identified the attempt prong of Hobbs Act robbery as the least

21

culpable conduct under that statute. *See Borden v. United States*, 593 U.S. 420, 424 (2021) ("If any – even the least culpable – of the acts criminalized do not entail that kind of force [needed for 'violence'], the statute of conviction does not categorically match the federal standard, and so cannot serve as [a] predicate."). Moreover, after *Taylor*, this Court in *United States v. Stevens*, 70 F.4th 653 (3d Cir. 2023), held that conspiring to commit completed Hobbs Act robbery – at least under a *Pinkerton* theory of liability – is a crime of violence. *Id.* at 655, 662–63.[10] Again, that would not have been possible after *Taylor* if the Hobbs Act robbery statute were indivisible. And although the Hobbs Act robbery statute imposes the same penalties for each identified infraction, *see* 18 U.S.C. § 1951(a), it employs several disjunctive constructions, *see id.*, so against the backdrop of *Taylor* and *Stevens*, it should not be viewed as an indivisible statute. But Jenkins-Armstrong does not set forth how the statute, treated as divisible for the conspiracy offense (and not charged on a *Pinkerton* theory), would be treated as a categorical mismatch with the crime-of-violence elements of § 924(c). Without doing so, Jenkins-Armstrong has not provided a cogent reason for setting aside his § 924(c) conviction.

### C. Nicholas Preddy

Another member of the Black Guerilla Family, Nicholas Preddy, was involved in the triple homicide. He was at the planning meeting in Hagerstown, and he traveled with the coconspirators to the farmette, where he acted as their lookout during the murders.

Almost a year later, in the spring of 2017, after another coconspirator, Jerell Adgebesan, told gang members that he had been contacted by investigators about the

---

[10] *See generally United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (explaining that *Pinkerton* "permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy"); *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946).

murders, Preddy and other gang members believed that Adgebesan was a 'snitch.' In May 2017, Preddy and other gang members tracked Adgebesan down in Baltimore and pulled him into a car as part of a plot to kill him. Their efforts failed, and Adgebesan escaped.

For his actions related not only to the triple homicide but also to his later attack on Adgebesan, a federal grand jury in Pennsylvania indicted Preddy on thirteen counts.[11] Under the terms of the plea agreement that Preddy entered, the Government agreed to drop all of the charges against him except for witness tampering. *See* 18 U.S.C. § 1512(a)(1)(A), (C); Fed. R. Crim. P. 11(c)(1)(A). Preddy then pleaded guilty to that offense, which required that he was motivated by a desire to prevent Adgebesan from *communicating* with law enforcement – not necessarily that Adgebesan was actually *cooperating* with the Government. *See United States v. Tyler*, 732 F.3d 241, 252 (3d Cir. 2013).

For that one charge, Preddy's base offense level was 33, and he had a criminal history category of III. Together, those yielded a Guidelines range of 135 to 168 months' imprisonment.

But as part of the plea agreement, the Government reserved the right to request the statutory maximum sentence of 360 months. *Cf.* Fed. R. Crim. P. 11(c)(1)(A). And at sentencing, the Government moved pursuant to Guideline § 5K2.21 for a seven-level upward departure so that he would receive the statutory maximum term of imprisonment. Section 5K2.21 is a policy statement that allows upward departures based on conduct underlying a dismissed or unpursued charge:

---

[11] The witness tampering occurred in Baltimore, but as stated in the third superseding indictment, Adgebesan would have been called "before a federal grand jury in Harrisburg." 3d Superseding Indictment 37 (D.C. Dkt. No. 499); *see* 18 U.S.C. § 1512(i) (allowing prosecuting "in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected").

> The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

U.S. Sent'g Guidelines Manual § 5K2.21 (U.S. Sent'g Comm'n 2021); *see* 18 U.S.C. § 3553(a)(5)(A) (requiring consideration of "any pertinent policy statement . . . issued by the Sentencing Commission").

In evaluating the applicability of § 5K2.21, the District Court considered the prior trial testimony of two coconspirators – one facing a capital sentence, the other life imprisonment. The District Court recounted that Preddy "joined together with several co-conspirators to travel from Baltimore, Maryland, to Mercersburg, Pennsylvania, to kill a known federal informant." Preddy Sent'g Hr'g Tr. 12:23–25 (Preddy App. 13). Preddy objected to the District Court's reliance on their testimony because he denied their account and because Jenkins-Armstrong told investigators that Preddy was not present for or involved in the triple homicide. The District Court, however, overruled that objection and determined that the Guidelines range did not account for Preddy's involvement in the triple homicide. Rather, from the District Court's perspective, this was "the quintessential case in which the guidelines range fails to adequately capture the full scope of, and therefore fails to reflect, the actual seriousness of . . . Preddy's criminal conduct." *Id.* 14:8–11 (Preddy App. 15). So, based on a preponderance of the evidence that Preddy had engaged in the uncharged conduct, the District Court departed upward and imposed the 360-month, statutory-maximum sentence. *See* U.S. Sent'g Guidelines Manual ch. 5 pt. A (U.S. Sent'g Comm'n 2021) (setting forth a 292-to-365-month sentencing range for a total offense level of 38 and a Category III criminal history); 18 U.S.C. § 1512(a)(3)(B)(ii) (setting a 30-year maximum sentence). *See generally United States v. Grier*, 475 F.3d 556, 568 (3d Cir.

24

2007) (en banc) (explaining that a preponderance-of-the-evidence standard governs factual findings at sentencing).

Preddy invoked this Court's appellate jurisdiction to challenge the procedural reasonableness of his sentence. *See* 18 U.S.C. § 3742. In his appeal, he argues that the District Court erred by crediting the testimony of the two coconspirators because he denied their accounts and because he did not have the ability to cross-examine those witnesses, who, as interested codefendants, were untrustworthy – especially in light of statements to law enforcement by another coconspirator, Jenkins-Armstrong, that Preddy was not present for or involved in the triple homicide.

Assuming *arguendo* that Preddy did enough to preserve an objection to the seven-level departure,[12] the District Court's decision to impose that enhancement is reviewed for an abuse of discretion. *See Gall*, 552 U.S. at 49 (holding that sentencing decisions are reviewed for abuse of discretion). Even accounting for concerns that the two testifying codefendants were unreliable because of their interest in getting lighter sentences by shifting blame to Preddy, their mutually corroborating statements, both based on personal knowledge, were accompanied by more than the "minimal indicium of reliability beyond mere allegation," *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007) (citation omitted), "sufficient . . . to support [their] probable accuracy," U.S. Sent'g Guidelines § 6A1.3(a) (U.S. Sent'g Comm'n 2024). *See United States v. Smith*, 751 F.3d 107, 116 (3d Cir. 2014); *United States v. Miele*, 989 F.2d 659, 665 (3d Cir. 1993). And although Preddy denied his involvement in those killings, the District Court was not required to believe his testimony or even the statements made to investigators by Jenkins-Armstrong.

---

[12] *See generally Spireas v. Comm'r*, 886 F.3d 315, 321 (3d Cir. 2018) (explaining that a party need only invoke "the same legal rule or standard" and "the same facts" to preserve an objection (quoting *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013))).

*See United States v. Rodriguez*, 342 F.3d 296, 300 n.5 (3d Cir. 2003) ("[T]he District Court is under no obligation to accept as true the defendant's own characterization of his role in the criminal scheme . . . ."). Thus, it was not an abuse of discretion for the District Judge to credit the accounts of the two coconspirators presented at trials over which he presided and that provided him an opportunity to observe and assess the credibility of those witnesses and their accounts. *See United States v. Hart*, 273 F.3d 363, 379 (3d Cir. 2001) ("[T]he sentencing judge may rely on extrinsic evidence in sentencing, even that from another trial.").

Nor does Preddy's inability to cross-examine those two witnesses at sentencing undercut the procedural reasonableness of the sentencing process. The right of confrontation attaches to "criminal *prosecutions*," U.S. Const. amend. VI (emphasis added), which do not include sentencing hearings, *see Williams v. Oklahoma*, 358 U.S. 576, 584 (1959) ("[O]nce the guilt of the accused has been properly established, the sentencing judge . . . may, consistently with the Due Process Clause[,] . . . consider responsible . . . 'out-of-court' information . . . ."); *see also Robinson*, 482 F.3d at 246 ("Both the Supreme Court and this Court of Appeals have determined that the Confrontation Clause does not apply in the sentencing context and does not prevent the introduction of hearsay testimony at a sentencing hearing.").

Similarly, Preddy's concerns about the introduction of those statements as hearsay at sentencing are unfounded. He did not raise any such objection in District Court, but even if he had, it would not have been an abuse of discretion for the District Court to have denied it because the Federal Rules of Evidence do not apply to sentencing hearings. *See* Fed. R. Evid. 1101(d)(3) ("These rules . . . do not apply to . . . miscellaneous proceedings, such as: . . . sentencing . . . .").

26

For these reasons, the District Court did not abuse its discretion in considering the uncharged conduct and coconspirators' statements, nor did it otherwise err in finding them reliable.[13]

\* \* \*

For the foregoing reasons, we will affirm the District Court's judgments with respect to all matters appealed.

---

[13] Without any abuse of discretion, Preddy has no credible cumulative-error argument. *See Collins v. Sec'y Pa. Dep't Corr.*, 742 F.3d 528, 542 (3d Cir. 2014) ("The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process.").